IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

LYNELL MARCUS BUTLER, et al.,      )
                                   )
      Plaintiffs,                  )
                                   )
v.                                 )
                                   )      No. 03-2650-TMP
SHELBY COUNTY GOVERNMENT,          )
CORIZON, INC., formerly known as   )
CORRECTIONAL MEDICAL SERVICES,     )
INC., et al.,                      )
                                   )
      Defendants.                  )

---

## MEMORANDUM OF OPINION AND ORDER

---

## I.  BACKGROUND

### A.  Case History

#### 1.  The Complaint

The plaintiffs are inmates and former inmates who were incarcerated at Shelby County Correctional Center ("SCCC") during various times in 2002 and 2003.[1]  (ECF No. 122-1, Amd. Compl.) This facility is under the control of defendant Shelby County Government ("Shelby County"), which contracted with defendant Correctional Medical Services[2] ("CMS") to provide medical services

---

[1]Although the amended complaint also alleged that the plaintiffs were detained at the Shelby County Jail, according to the plaintiffs' own admissions, they were inmates only at SCCC during the relevant time period.  (ECF No. 270-2.)

[2]CMS is now known as Corizon, Inc.

for the inmates housed at SCCC, and with Annie's Pest Control, Inc. for pest control services.[3]   The plaintiffs alleged that during 2002 and 2003, they were bitten by brown recluse spiders, Shelby County allowed SCCC to become "infested and/or reinfested" with spiders and failed to keep these facilities free of dangerous conditions, and the defendants failed to meet the plaintiffs' medical and safety needs.   (Id. IV ¶¶ 1, 3, 6, 7.)   Plaintiffs further alleged that individuals seeking to investigate the problems at these facilities on behalf of the plaintiffs were denied access to the plaintiffs, the defendants failed to adequately diagnose and treat plaintiffs, and they failed to investigate their complaints or take adequate remedial action, which amounted to negligence, gross negligence, and deliberate indifference.[4]   (Id. IV ¶¶ 5, 9-11.)   Plaintiffs alleged that the

---

[3]On February 10, 2006, the Clerk of Court entered default judgment against Annie's Pest Control, in the amount of $5,000 for each of the twenty-seven plaintiffs named in the Amended Complaint, for a total award of $135,000.00.   (ECF No. 129.)   These twenty-seven plaintiffs include: Kevin Michon Anderson, Michael Eugene Biggs, Marvell Lashun Bolton, Clifton Bowles, Johnny Yuma Bonds, Julius Cameron Braswell, Judune Lever Brown, Lynell Marcus Butler, Marcus Danner, Carl Frederick Davis, Tyrone L. Dyson, Tim Edwards, Andrew Tyrone Giden, Nico Antoine Gilkey, Timothy Greer, Marvin Jenkins, Randy G. Johnson, Antonio Lipsey, Johnny Antonio Maxwell, Rodrigues McKinney, Timothy Wayne Murley, William L. Ohman, Donald Owens, Tony Neal a/ka/ Paulo Ross, Elton Sylvester Rubin, Jr., Antonio R. Sanders, and Christopher Winston.

[4]Plaintiffs also listed as defendants unnamed officers, deputy jailers, prison staff, Shelby County supervisors, medical staff, and pest control employees.   However, the plaintiffs never identified these "John Doe" defendants.

"[r]epeated spider bites and delays and inadequate prison healthcare resulted in cruel and unusual punishment" under the Eighth and Fourteenth Amendments. (<u>Id.</u> IV ¶ 7, V ¶ 1.) Plaintiffs contended that the defendants were deliberately indifferent in the recruitment, oversight, hiring, training, discipline, and supervision of Deputy County Jailers, SCCC employees, CMS employees, and pest control employees, and as a result manifested a callous and reckless disregard for the rights of the plaintiffs. (<u>Id.</u> ¶¶ 13, 35, 36, 37.)

Plaintiffs claimed that the defendants deprived them of their rights under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983. (<u>Id.</u> V ¶¶ 1, 2.) Plaintiffs asserted conspiracy claims under 42 U.S.C. §§ 1985 and 1986. Plaintiffs further asserted state law claims for medical malpractice, negligence, intentional infliction of emotional distress, and violations of the Tennessee Constitution. (<u>Id.</u> V ¶ 20.) Plaintiffs sought compensatory and punitive damages, as well as an award of attorney's fees. (<u>Id.</u> V ¶¶ 2, 3.)

    2.   <u>The Parties</u>

The plaintiffs originally included fifty-four inmates and former inmates.[5] A discussion of the procedural history of this

---

[5]The original complaint was filed by plaintiff Lynell Butler. However, the district court later granted leave to amend the complaint to expand the case to include a total of fifty-four

case is contained in the court's Order Granting in Part and Denying in Part Motions to Dismiss and Denying Motions for Summary Judgment ("Order I") and Order on Shelby County's Motions for Summary Judgment ("Order II"). (ECF Nos. 168, 274). By two separate orders entered on June 30, 2008, the court dismissed with prejudice thirty-five plaintiffs pursuant to Federal Rules of Civil Procedure 37 and 41(b). (ECF Nos. 150, 214, 215.) Specifically, the June 30, 2008 Order Granting Defendants' Motion to Dismiss and Adopting Report and Recommendation (ECF No. 215) dismissed the following plaintiffs: Stacy Greer, John Hill, Bronson Clay, Mario Dewayne Bobo, Ray Burcham, Warren Ghan, James R. Jackson, Jevon Barnes, John Thomas Brooks, Calvin Ivory a/k/a Calvin Ivery, Ray Kelley, Marvin Mathews, Courtney Nicholson, James Patterson, Byron Williams a/k/a "Vyrone Dwyone Willaims," Kevin White, Myron Arps, Marvin Jackson, Jeremy Garrot a/k/a Jeremy Garrott, Alonzo Johnson, Richard Martin, Willie Williams, Carl Smith, Tommy Jackson, Troy Jackson, Antonio Johnson, and Daniel Kevin Wright. In a separate order entered on June 30, 2008, Order Dismissing With Prejudice Plaintiffs Biggs, Bowles, Bolton, Davis, Jenkins, Murley, Neal, and Owens, and Amending Scheduling Order (ECF No. 214), the court dismissed the following plaintiffs: Michael Biggs, Clifton Bowles, Marvell Lashun Bolton, Carl Frederick Davis, Marvin Jenkins,

---

inmates and former inmates. Subsequently, the parties through their counsel consented to the exercise of jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Timothy Wayne Murley, Tony Neal a/k/a Paulo Ross, and Donald Owens.

On January 15, January 29, and April 30, 2013, the court entered orders granting motions to dismiss filed jointly by defendant CMS and plaintiffs Kevin Anderson, Johnny Bonds, JuDune Brown, Marcus Danner, Nico Gilkey, Andre Giden, Timothy Greer, Pearlie May Lipsey on behalf of Antonio Lipsey[6], Johnny Maxwell, William Ohman, Tony Sanders, and Christopher Winston. (ECF Nos. 297, 299, 303.) Therefore, these twelve plaintiffs no longer have any claims against CMS. The only plaintiffs who have claims against CMS are Julius Braswell, Lynell Butler, Tyrone Dyson, Tim Edwards, Randy Johnson, and Elton Rubin, Jr.

3.   Orders I & II

In Order I, the court dismissed all of the plaintiffs' § 1983 claims based on violations of the First, Fourth, and Sixth Amendments, their conspiracy claims brought under §§ 1985 and 1986, and their claims based on violations of the Tennessee Constitution. The court dismissed the plaintiffs' intentional infliction of emotional distress claims against Shelby County and punitive damages claims against Shelby County. The court also dismissed the § 1983 claims brought by Rodrigues McKinney, as being barred by the one-year statute of limitations. Based on that order, the only

_____

[6]Antonio Lipsey died on June 3, 2006, for reasons unrelated to the alleged injuries at issue in this case. (ECF No. 270-8, Pearlie Mae Lipsey Dep. at 6.) The court granted plaintiff's motion to substitute Lipsey's mother, Pearlie May Lipsey, as a party. (ECF No. 229.)

claims that remained against Shelby County were violations of the Eighth and Fourteenth Amendments and state law claims of negligence. The claims that remained against CMS were violations of the Eighth and Fourteenth Amendments, and state law claims of medical malpractice, negligence, and intentional infliction of emotional distress.

In Order II, the court granted summary judgment in favor of Shelby County on all remaining § 1983 claims against the county. Specifically, the court concluded (1) the single claim for injuries on September 4, 2002 brought by Randy Johnson, the 2001 claim for injuries brought by Tyrone Dyson, the May 2002 claim for injuries brought by Tim Edwards, and the September 2001 and August 2002 claims for injuries brought by Tony Sanders, were all barred by the one-year statute of limitations for personal injury and civil rights claims; (2) Marcus Danner, Tyrone Dyson, Tim Edwards, Andre Giden, Timothy Greer, Antonio Lipsey, William Ohman, Elton Sylvester Rubin, Jr., and Tony Sanders (the "Inmate Plaintiffs") failed to exhaust their § 1983 claims, as required by the Prison Litigation Reform Act ("PLRA"); (3) Shelby County's alleged actions or inactions in addressing the spider infestation problems and providing medical care at SCCC did not rise to the level of deliberate indifference, and thus plaintiffs' claims based on Eighth Amendment violations failed; and (4) plaintiffs offered insufficient evidence to show that Shelby County had a custom or

policy, or policy of inaction, that was the "moving force" behind any constitutional violation.[7]

### 4. 2012 Ruling

In 2012, the court announced its ruling on CMS's Renewed Motion for Summary Judgment and on the remaining negligence claims against Shelby County ("2012 Ruling"). (ECF No. 285, Minute Entry.) With regard to CMS's summary judgment motion, the court granted in part CMS's motion and (1) dismissed the remaining state law claims brought by Rodrigues McKinney on statute of limitations grounds; (2) dismissed the single claim brought by Randy Johnson, the 2001 claim for injuries brought by Tyrone Dyson, the May 2002 claim for injuries brought by Tim Edwards, and the September 2001 and August 2002 claims for injuries brought by Tony Sanders, as these claims were barred by the one-year statute of limitations for personal injury and civil rights claims; (3) dismissed the § 1983 claims of the Inmate Plaintiffs based on their failure to exhaust their claims as required by the PLRA; (4) dismissed the § 1983 claims to the extent the claims were based on inadequate medical

---

[7]The case of Sain v. Wood, 512 F.3d 886 (7th Cir. 2008), further supports the court's decision. In Sain, the Seventh Circuit held that a "policy of 'frequent' exterminations in this case, made monthly and in response to plaintiff's requests, certainly cannot support a claim of deliberate indifference here"). Id. at 895. Likewise, the affidavits and pest control records attached to Shelby County's original motion to dismiss (ECF No. 137) and renewed motion for summary judgment (ECF No. 263) evidence a policy of frequent exterminations, and thus plaintiffs' claims of deliberate indifference cannot survive summary judgment.

care provided once the plaintiffs were seen by CMS staff for their alleged injuries; (5) dismissed the plaintiffs' medical malpractice claims; and (6) dismissed the intentional infliction of emotional distress claims. The court denied CMS's summary judgment motion to the extent the plaintiffs' § 1983 claims and negligence claims were based on delays in receiving medical treatment. Regarding the remaining negligence claims against Shelby County, the court granted summary judgment and dismissed those claims based on sovereign immunity.

In so ruling, however, the court noted that the record was unclear as to which, if any, of the plaintiffs might have viable causes of action based on delays in receiving medical treatment. The court also noted that it was not clear from the record whether Shelby County or CMS, or both, were responsible for any such delays in medical treatment. The plaintiffs were directed to file their interrogatory responses - which were heavily relied upon in their opposition briefs but which had not been attached as exhibits to their response briefs - with the court.[8] Subsequently, the plaintiffs filed those interrogatory responses, along with a

_____

[8]In the Plaintiffs' Statement of Material Facts in response to CMS's and Shelby County's renewed motions for summary judgment, several plaintiffs cited to "Exhibit 2" in support of additional facts. (ECF No. 269-1 at 9-33; ECF No. 270-2 at 45-70.) However, Exhibit 2 contained responses only to interrogatories 6 and 7, which in turn pertained only to grievances. The plaintiffs subsequently filed Exhibit 2, which contains approximately 400 pages of interrogatory responses.

memorandum.  Thereafter, Shelby County and CMS filed responses to the plaintiffs' memorandum, along with various affidavits and exhibits.

This Memorandum of Opinion and Order memorializes the court's 2012 Ruling, and *sua sponte* amends that ruling based on the parties' filings received by the court subsequent to that ruling. The court grants summary judgment in favor of CMS as to all claims brought by plaintiffs Julius Braswell, Lynell Butler, Tyrone Dyson, Tim Edwards, Randy Johnson, and Elton Rubin, Jr.  The court grants summary judgment in favor of Shelby County as to the negligence claims brought by all plaintiffs.

## B.   Facts

The following facts are viewed in the light most favorable to the plaintiffs as the non-moving party and are based on the evidence submitted by the parties, including the plaintiffs' medical records for treatment they received at SCCC[9]; the affidavit and deposition of Dr. Kerry O. Cleveland, M.D.; the depositions of the eight plaintiffs who were deposed: Butler, Dyson, Gilkey,

---

[9]All of the parties relied heavily on the plaintiffs' medical records in support of and in opposition to the summary judgment motions.  See Meller v. Meller Management, LLC, No. 10-6018, 2011 WL 2260923, at *9 (W.D. Ark. June 8, 2011) ("medical records are admissible under Federal Rules of Evidence 803(4) and 803(6) and may be considered for summary judgment").  Unless otherwise noted, all of the medical treatment discussed in this section took place at SCCC.

Greer, Pearlie Lipsey, Rubin, Sanders, and Winston[10]; the complete set of plaintiffs' interrogatory responses; and the parties' post-ruling filings, including all attached affidavits and exhibits.[11]

1. Dr. Kerry O. Cleveland

Kerry O. Cleveland, M.D., is board certified in Internal Medicine and Infectious Diseases. (ECF No. 243-2.) In his affidavit, Dr. Cleveland states that he has reviewed the medical records for each plaintiff, including the records from SCCC, The Regional Medical Center at Memphis ("the Med"), and other medical providers. He states that he has reviewed the depositions of all plaintiffs who have been deposed in this case, namely, Butler, Dyson, Giden, Greer, Pearlie Lipsey, Rubin, Sanders, and Winston. According to Dr. Cleveland:

> CMS, through its medical providers, did not deviate from the applicable standard of care in the treatment of plaintiffs Kevin Anderson, Johnny Bonds, Julius Braswell, JuDune Brown, Lynell Butler, Marcus Danner, Tyrone Dyson, Tim Edwards, Andre Giden, Nico Gilkey, Timothy Greer, Antonio Lipsey, Johnny Maxwell, William Ohman, Elton Rubin, Tony Sanders, and Christopher Winston. CMS was, at all relevant times, addressing these plaintiffs' complaints and treating them based upon observations of

[10]None of the other plaintiffs were deposed.

[11]The court has included the medical evidence for all plaintiffs, including those twelve plaintiffs who have since dismissed their claims against CMS: Kevin Anderson, Johnny Bonds, JuDune Brown, Marcus Danner, Nico Gilkey, Andre Giden, Timothy Greer, Pearlie May Lipsey on behalf of Antonio Lipsey, Johnny Maxwell, William Ohman, Tony Sanders, and Christopher Winston. The court has included this evidence because it may be relevant to claims brought by the six remaining plaintiffs who still have claims against CMS, such as evidence of a policy or custom.

plaintiffs' conditions. Based upon my training, experience, and review of the records, plaintiffs more likely than not suffered from boils, furuncles, and/or abscesses, rather than spider bites. However, even if plaintiffs were bitten by spiders, they were treated appropriately, and their skin conditions did not warrant immediate referral to an outside hospital. In fact, most spider bites resolve without medical intervention. In appropriate instances and at appropriate times, some plaintiffs were referred to The Regional Medical Center for further treatment. No action or inaction on the part of CMS medical providers caused or contributed to any injury or harm to these plaintiffs.

(Id.) Dr. Cleveland was also deposed about his opinions. He testified that "there were other explanations for most of the skin lesions if not all of the skin lesions and that most of these [plaintiffs] may not have suffered from spider bites at all, . . . [or] if they were spider bites, most of them suffered no lasting damage or harm and they were dealt with, diagnosed and treated appropriately for the conditions that they had." (ECF No. 270-13, Cleveland Dep. at 14.) Dr. Cleveland testified that just because a medical record reflects that a particular patient complained that he was bitten by a spider does not mean that the health care professional who treated the patient found that the patient was, in fact, bitten by a spider. (Id. at 16.) Based on his review of the medical records, Dr. Cleveland opined that he did not believe any of the plaintiffs had a definitive diagnosis of a brown recluse spider bite. (Id. at 16.) He testified that the plaintiffs more

likely than not suffered from boils, furuncles, or abscesses.[12] (Id. at 18-19.)  He further testified that "[i]n this community, most things that are felt to be brown recluse spider bites are not brown recluse spider bites.  Most brown recluse spider bites resolve without any treatment whatsoever so the most common treatment for brown recluse spider bite is to do nothing or to treat the patient symptomatically. . . . Only a very tiny minority of things that are felt to be brown recluse bites are brown recluse bites and, even a very smaller percentage of those actually develop significant disease from it."  (Id. at 20-21, 29.)

    2.  Kevin Anderson

    According to the medical records, Kevin Anderson was seen by a nurse practitioner, Ron Abston, on March 31, 2003, for a swollen "pinkie" finger on his left hand.  (ECF No. 243-1 at 1.)  Nurse Abston assessed the condition as an abscess with cellulitis.  (Id.)  Anderson was given ibuprofen and antibiotics.  (Id.)  He was seen by the medical staff on April 1, 2003, and then again on April 6, 2003, when his dressing was changed.  (Id. at 4.)  At the time, it was noted that there was a very small amount of yellow drainage on the left pinkie finger.  (Id.)  No other medical records reflect care to his finger after the April 6 visit.

    In Anderson's Statement of Material Facts in response to CMS's

---

[12]Dr. Cleveland described furuncles as an infection of the skin due to staphylococci and are a type of a small abscess.  (Cleveland Dep. at 28.)

and Shelby County's motions for summary judgment ("SMF"), he states that he was bitten by a brown recluse spider on his buttock and arm; he was seen by the medical unit about six or seven days after he was bitten; he put in a medical request form but was not seen by a doctor; and he was seen for a follow-up visit two weeks later and was given additional medication. (ECF No. 269-1 at 9-10; ECF No. 270-2 at 45.) According to Anderson's supplemental response and interrogatory responses ("Supplemental Response"), he was bitten by a spider on March 24, 2003, while housed in the "J Building, C Pod." (ECF No. 287 at 282.) He claims he notified two SCCC employees, an "Officer J. Jones" and an "Officer Wade" on March 28, 2003, that his finger was "full of puss due to a spider bite and had swollen very badly and whole left side was hurting." (ECF No. 287 at 273, 282, 283.) He also states that he filed a grievance form on April 4, 2003, approximately four days after he saw the nurse practitioner. (ECF No. 287 at 276, 283.) However, Shelby County has no record of this grievance. (ECF No. 293 at 3.) He further states that

> My arm turned blue and I could not move it. It hurt my finger all the way to my neck. I could not turn my neck or move my arm. After four or five days the nurse came around and I showed her my bite. She sent me downstairs. The nurse said that I would have died if I had not come down in the next 15 minutes, that the poison was near my heart. I was supposed to have been sent to the outside Med. They have me [on] penicillin and a shot. I suffer from fear of spiders.

(ECF No. 287 at 283.)

3.  <u>Johnny Bonds</u>

According to the medical records, Johnny Bonds saw a doctor on March 18, 2003, for a complaint of a spider bite on his right buttock, which he said happened three or four days earlier. (ECF No. 244-2 at 1.)  He was seen by Dr. Nwannem Obi-Okoye, who observed a lesion and assessed the condition as "cellulitis right buttock secondary to spider bite." (<u>Id.</u>)  He was treated with ibuprofen and antibiotics. (<u>Id.</u>)  He was seen again on March 20, 21, 23, 24, 25, 27, and 31, and April 1 and 7, 2003, to change the dressing and drain pus from the lesion.  On April 8, Bonds was examined by Dr. Obi-Okoye, who noted that the lesion had completely healed.[13] (<u>Id.</u> at 11.)  On July 3, 2003, he was seen at the medical unit and complained of another spider bite on his right buttock. (<u>Id.</u> at 14.)  He was treated with ibuprofen and antibiotics.  On July 9, he had his dressing changed and pus drained from the lesion.  He went to the medical unit again on July 11, for a dressing change, and it was noted that "area on right hip is no longer draining or inflammed [sic]." (<u>Id.</u> at 17.)  On July 16, Bonds was seen by Nurse Abston for a sore on his left-hand finger. (<u>Id.</u> at 18.)  He was assessed with folliculitis (inflammation of hair follicles) and was given antibiotics.[14] (<u>Id.</u>)  On July 18, he

---

[13]He refused to come to sick call on April 28. (<u>Id.</u> at 12.)

[14]Dr. Cleveland testified that it would be "extraordinarily unusual and uncommon" to get folliculitis from a spider bite. (Cleveland Dep. at 99-100.)

was seen by Dr. Obi-Okoye for further treatment of his finger, at which time the doctor noted cellulitis on Bond's finger. (<u>Id.</u> at 19.) He was treated with ibuprofen and antibiotics. (<u>Id.</u>) He was seen on July 28, by Dr. Obi-Okoye, who noted that the lesion had healed and the cellulitis had resolved.[15] (<u>Id.</u> at 20.) He saw a nurse on July 29 and then saw Nurse Abston on July 31, who noted that the cellulitis had resolved. (<u>Id.</u> at 22.)

According to Bonds's SMF, he filed an inmate grievance form on March 12, 2003, regarding the failure to receive medical treatment for his spider bite. (ECF No. 270-2 at 45; ECF No. 287 at 290.) However, the grievance form is actually dated March 18, 2003 (not March 12), and in it Bonds refers to his medical visit on March 18. (ECF No. 149, Ex. D.) Moreover, the CMS records show that Bonds submitted his medical request form on Saturday, March 15, and he was seen by CMS on March 18. (<u>Id.</u>) In his interrogatory responses, Bonds was unable to identify any injuries, either physical or mental, caused by the spider bite or his medical treatment. (ECF No. 287 at 290.)

4. <u>Julius Braswell</u>

According to the medical records, Julius Braswell was seen by the medical staff on November 11, 2002, complaining of a spider

---

[15]It does not appear from the record that Bonds filed a grievance for the alleged spider bite that occurred after his initial spider bite on or about March 12, 2003. (ECF No. 270-2 at 45; ECF No. 149 Ex. D.)

bite on his forehead, but he refused treatment at that time. (ECF No. 245-2 at 1.) On November 18, he saw Dr. Obi-Okoye, for a complaint of a spider bite on his nose, which he said happened two or three days earlier.[16] (Id. at 2.) He was treated with ibuprofen and antibiotics. He saw Dr. Obi-Okoye on November 21, at which time it was noted that the lesion on his nose was resolving. On December 31, 2002, Braswell was seen by Nurse Abston for a complaint of spider bites on his tailbone area and chest.[17] He was treated with antibiotics. On January 23, 2003, he reported to the medical unit for a complaint of another spider bite near his tailbone area, which he said happened five days earlier. (Id. at 9.) He was treated by Dr. Obi-Okoye with antibiotics. (Id.) On January 27, during pill pass Braswell told Nanette Jefferson, a nurse, that he needed to be seen by a doctor that day, and he was told to talk to Nurse Melinda Mello so that he could be put on the sick call list. (Id. at 10.) Braswell said he would talk to his

---

[16]Dr. Cleveland testified that, in his opinion, the lesions on Braswell's nose were the result of a staph infection unrelated to bites by brown recluse spiders. He based his opinion on his training and experience, in that brown recluse spiders rarely bite a person's face and because staph bacteria are frequently carried within the nose and "we see very commonly these pustular or pus-filled lesions as opposed to necrotic or ulcerative type lesions on the nose and the face due to staph rather than due to brown recluse bites." (Cleveland Dep. at 53.)

[17]The medical records from December 31 also note "internal fistula continues to bleed daily." According to Dr. Cleveland, this condition is unrelated to the complaints of spider bites because "it seems extraordinarily unlikely" that a spider bite could cause an internal fistula. (Cleveland Dep. at 56.)

mother and walked away. (Id.) On January 28, Braswell was sent to the emergency room at the Med for "incision and drainage" of a furuncle on his buttock area. (Id. at 11.) Braswell was next seen on January 29, by Dr. Obi-Okoye, at which time his dressing was changed and he was given antibiotics. (Id. at 13-14.) He saw Dr. Obi-Okoye on January 30, and his dressing was changed and he was given pain medication. (Id. at 15.) He saw the nurse for dressing changes on January 31 and February 2, 3, 5, 7, 9, 10, and 11, 2003.[18] On February 11, Dr. Obi-Okoye examined Braswell and noted that the furuncle had healed and that he had no complaints. (Id. at 29.) On February 13, he reported to the medical unit that he had a fear of spiders and that he was afraid to sleep for fear that the spiders would bite him. (ECF No. 270-2 at 32). He was seen on March 31, 2003, by Dr. Obi-Okoye, complaining of itching near the area of the spider bite. (Id. at 33.) Dr. Obi-Okoye noted that the "lesion is completely healed, non tender." (Id.)

In Braswell's SMF, he states he was bitten twice around January 22, 2003, on the nose and near his tailbone, and that he killed the spider; and that the "outcome of my spider bites and lack of immediate medical attention has led to facial swelling, difficulty breathing, eating, nightmares, irritable, afraid, paranoia stress disorder, difficulty making bowel movements,

---

[18]The medical records indicate that Braswell refused a dressing change on February 3 and 10.

walking and unable to sit normally, fear of sleeping because of spiders, [and] unable to pay attention to detail." (ECF No. 269-1 at 10-11; ECF No. 270-2 at 46-47; ECF No. 287 at 296.)

According to Braswell's Supplemental Response, he states that he filled out medical request forms and verbally complained to unidentified guards on January 22 and January 28, 2003. (ECF No. 288 at 3; ECF No. 287 at 295.) He was treated on January 24 by Dr. Obi-Okoye and a nurse (the medical records, however, show that he was seen on January 23). (ECF No. 287 at 296.) He was examined by a nurse in his cell on January 27, 2003, who cleaned the infected area and dressed it. (Id.) He states that he saw Dr. Obi-Okoye on January 28 and was transported to the Med for treatment. (Id.)

5. JuDune Brown

According to the medical records, JuDune Brown saw Dr. Obi-Okoye on November 1, 2002, and complained of a spider bite on his upper left leg. The doctor noted "left upper thigh cellulitis 2 degree to spider bite (small 0.2 cm x 0.1 cm)." She treated him with ibuprofen and antibiotics. There are no other records of additional visits to the medical unit by Brown for his alleged spider bite. Dr. Cleveland testified at his deposition that the measurements of the "bite" were not consistent with a spider bite: "The size is extraordinarily small; point two by point one centimeter, and most spider bites that develop the manifestations where one thinks they appear to be spider bites would usually be

larger than that.  So, given the fact that - that true spider bites are extraordinarily uncommon and that's an extraordinarily small lesion, I think it makes it more likely than not that it is not a spider bite."  (Cleveland Dep. at 60.)

In Brown's SMF, he states he was bitten by a brown recluse spider on the upper left buttock around October 19, 2002, and a nurse told him that it was a brown recluse spider that bit him. (ECF No. 269-1 at 12; ECF No. 270-2 at 47; ECF No. 287 at 302.) According to his Supplemental Response, Brown claims he notified his lawyer about the spider around October 19.  (ECF No. 288 at 3.) However, he does not claim that either he or his lawyer notified Shelby County or CMS about the bite prior to November 1, 2002. According to his interrogatory responses, he does not claim any injury, either physical or mental, caused by the spider bite.  (ECF No. 287 at 302.)

6.  <u>Lynell Butler</u>

According to the medical records, Lynell Butler was seen by Nurse Abston on October 1, 2002, for a complaint of a spider bite. (ECF No. 247-2 at 1.)  The nurse noted a "1 cm ulceration" on Butler's lower right leg.  (<u>Id.</u>)  He was given ibuprofen and antibiotics.  (<u>Id.</u>)  On October 4, he was seen by Nurse Abston for the same complaint.  (<u>Id.</u> at 3.)  The records reflect that "the lesion has worsened since last exam.  Now the erythematous area is about 2 inches in diameter and the area is warm to touch."  (<u>Id.</u>)

The nurse assessed the condition as a "furuncle with cellulitis," and gave him ibuprofen, Tylenol, and antibiotics.[19]  (Id.)  On October 8, Nurse Abston made a small incision in the abscess and pus was expressed from the abscess.  (Id. at 8.)  On October 9, Butler was seen with "no improvement to the abscess, the total size of the abscess is 3" in diameter, very little pus."  (Id. at 10.)  After Nurse Abston spoke to Dr. Obi-Okoye about the abscess, Butler was sent to the Med's emergency room that same day.  (Id.)  At the Med, he was seen by Dr. Daniel Beene, who made an incision and drained the abscess.  (ECF No. 270-2 at 29-30.)  On October 10, Butler saw Nurse Abston, who noted "site looks a little better today - swelling and redness appear slightly decreased."  (ECF No. 247-2 at 12.)  The nurse gave Butler ibuprofen and antibiotics.  On that same day, Butler had his dressing changed.  (Id. at 15.)  Butler returned for a follow-up visit to have his dressing changed on October 11, 13, 16, and 17.  On October 18, he was seen by Nurse Abston, who observed that the "site looks good.  Ulcreation is filling in.  Erythema and induration have lessened greatly."  (Id. at 21.)  On October 19, Butler visited the medical unit, when it was noted "poor wound healing complicated by diabetic condition."  (Id. at 22.)  Butler saw the nurse for dressing changes and to have

_____

[19]Dr. Cleveland testified that the furuncle noted by the nurse on the October 4 examination of Butler was not likely caused by a spider bite.  (Cleveland Dep. 64.)  He opined that the lesion became worse because it became infected.  (Id. at 66-67.)

his recovery monitored on October 20, 21, 22, 23, 24, and 25, 2002.

Butler testified at his deposition that he was bitten by a spider on his leg while he was asleep at night, causing his hand, arm, and leg to swell.[20] (ECF No. 270-6, Butler Dep. at 25-28.) He did not see the spider that bit him. (<u>Id.</u> at 25.) By 7:00 a.m. the next morning, the swelling in his hand and arm had gone down. (<u>Id.</u> at 29.) He told a SCCC guard that he had been bitten by a spider. (<u>Id.</u> at 25.) He saw the nurse practitioner that same morning. (<u>Id.</u> at 30, 32-33, 89.) He testified that he was seen by the nurse within hours after he was bitten by the spider. (<u>Id.</u> at 88-89.) He testified that he submitted a grievance on that same day about the spider bite, although he did not know what became of it. (<u>Id.</u> at 75.) He was initially told by the nurse that he had a boil, and then he was told he had a staph infection, and he was later told that it was a spider bite. (<u>Id.</u> at 38.) The nurses worked on the wound for several days but were unsuccessful. (<u>Id.</u> at 92.) Butler kept "begging" Nurse Abston to let him see a doctor. (<u>Id.</u> at 26, 35.) Butler told Nurse Abston that he had diabetes, but the nurse kept saying "just let me work on it another day" and kept "cutting" at the wound without success. (<u>Id.</u> at 26.)

---

[20]Butler testified that he believed the spider bite occurred sometime in August or September 2002. (<u>Id.</u> at 29). However, he also testified that he was seen by the nurse practitioner the morning after he experienced the bite. (<u>Id.</u> at 30, 32-33, 83, 89.) The medical records show that the first time he was seen for any alleged spider bite was on October 1, 2002.

Butler was later admitted to the Med, where a "big old core" was cut out of his leg. (Id. at 37.) According to Butler, he was told by a doctor and nurse at the Med that he had a spider bite. (Id. at 44.) Butler testified that the medical staff "didn't take care of me enough and I could have lost my leg. And I had a hole in my leg so big if you had seen it, you wouldn't have believed it. You could see the bone, as a matter of fact." (Id. at 33.) He testified that he has nightmares about the spider, and that "[my wife] about to leave me about this spider bite because I scream at night. I be about to jump out of the bed and stuff. I wake up screaming at night sometimes about this spider." (Id. at 33-34, 39.) According to Butler, the wound in his leg was the size of a silver dollar. (Id. at 44-45.) Importantly, Butler does not complain about any delay in seeing a medical professional while at SCCC. Instead, he believes that after he saw the nurse at SCCC, he should have been sent to the Med sooner. (Id. at 39; 81-82.) He also believes that he was incorrectly diagnosed by Nurse Abston as having a boil, instead of a spider bite. (Id. at 39.)

    7.  Marcus Danner

    According to the medical records, Marcus Danner was seen by the medical staff on December 5, 2002, and complained of a spider bite on his right forearm. The records noted "center core has blood." (ECF No. 248-2 at 1.) He stated that he had been bitten twelve hours ago, and complained of numbness and pain in his

forearm.  (Id.)  The wound was cleaned and he was given ibuprofen and antibiotics.  (Id.)  The records reflect that he was given "spider bite protocol."[21]  (Id.)  On December 6, Danner reported to Nurse Mello that he had another spider bite on his left buttock, which he said happened three days earlier.  (Id. at 2.)  The nurse cleaned and dressed the area, gave him a penicillin injection, and notified Dr. Obi-Okoye.  (Id. at 2-3.)  On that same day, Dr. Obi-Okoye examined Danner and observed a lesion "with a 0.5 cm x 0.2 cm central nectrotic area."  (Id. at 4.)  He was given antibiotics. His wound was cleaned on December 7 and 9.  On December 9, Dr. Obi-Okoye examined Danner and noted that the wound on his right forearm was resolving and he had no new complaints.  (Id. at 7.)  An examination by a nurse on December 10 revealed that "left buttock area is resolved.  No open areas seen."  (Id. at 9.)  On January 6, 2003, Danner saw Dr. Obi-Okoye and complained of another spider bite on his buttock, which he said happened three days earlier. (Id. at 10.)  The doctor noted "spider bite lesion sacral area." (Id.)  He was given ibuprofen and antibiotics.  (Id.)  On January 31, he saw Dr. Obi-Okoye for boils under his left arm, which he said happened three days earlier.  (Id. at 11.)  The doctor noted "left axillary furuncles with red streak on inner left arm," and

---

[21]Dr. Cleveland testified that he believes "spider bite protocol" involves telling the patient how to take care of suspected or proven spider bites, or possibly the medical clinic personnel giving the patient instructions on how to care for the wound. (Cleveland Dep. at 76.)

gave him ibuprofen and antibiotics.  (Id.)  On February 3, 2003, he saw Dr. Obi-Okoye, who conducted an incision and drainage procedure on the furuncle on his left arm.  (Id. at 12.)  On February 4, he saw Dr. Obi-Okoye for a follow-up exam, at which time she noted that he had no complaints and the furuncle was resolving with "minimal drainage" and "no longer swollen."  (Id. at 13.)

In Danner's SMF, he states he was bitten by a spider in December 2002 on the right arm, in February 2003 on the right buttock, and in March 2003 on the right buttock; he filled out four medical request forms to see a doctor; he was denied treatment in December 2002 but was seen by a doctor in February 2003 when his infection was removed; he was given a shot and pills by a doctor in March 2003; and he has scarring as a result of the bites and lack of adequate medical attention.  (ECF No. 270-2 at 51; ECF No. 287 at 315.)  In his Supplemental Response, Danner presents the same evidence and arguments contained in his original response to the defendants' motions and in his Statement of Material Facts.

8.  Tyrone Dyson

According to the medical records, Tyrone Dyson saw Dr. Henry Stamps on December 23, 2002, for a "possible spider bite" on his right thigh.  (ECF No. 249-2 at 1.)  He was given an antibiotic.  (Id.)  On December 31, Dyson saw Dr. Stamps again, at which time Dr. Stamps conducted an incision and drainage procedure on an abscess on his right thigh.  (Id. at 2.)  On January 15, 2003, he

-24-

was seen by Nurse Abston for sores on his leg. The records indicate "(r) inner upper thigh has an indurated reddened area approx. 1" in diameter . . . there is also a smaller similar lesion developing." (Id. at 4.) Nurse Abston assessed the condition as a furuncle forming, and gave him antibiotics. (Id.) On January 21, he saw Nurse Abston for a follow-up on his boils, and the nurse noted that the lesions had healed. (Id. at 5.) On February 14, 2003, Dyson reported to Nurse Abston with a sore in his nose. (Id. at 9.) The nurse noted a lesion on the nose and gave him antibiotics. On February 17, he returned to the medical unit for a "boil in nose" and "soreness in left side of neck." (Id. at 11.) Nurse Abston continued him on antibiotics and gave him ibuprofen. (Id.) On February 19, Earnestine Eason, a nurse practitioner, examined Dyson and noted that the lesion in his nose had improved and the boil had resolved. (Id. at 12.) On May 8, 2003, Dyson saw Nurse Abston and complained of a sore in his nose, which he said was a recurring problem every two to three weeks. (Id. at 18.) He was treated with antibiotics and an ointment. (Id.) On June 10, 2003, he saw Nurse Abston for a sore in his nose.[22] Nurse Abston observed that "this is a recurring problem" and noted a postular

_____

[22]In Dyson's Supplemental Response, he states that he was transferred to the Med on June 11. (ECF No. 288 at 5.) However, the medical records do not support this contention. The records from June 11 show only that his medication was reordered. (ECF no. 249-2 at 22.) Moreover, Dyson does not state the reason why he was purportedly transferred to the Med, or whether it was related to his treatment for alleged spider bites.

-25-

lesion above his right ear. (Id. at 21.) The nurse assessed the
condition as a furuncle, and gave him ibuprofen and antibiotics.
(Id.) On June 18, he saw Nurse Abston again for a sore in his
nose, and the nurse assessed the condition as folliculitis. (Id.
at 23.) He was given an antibiotic ointment. On July 1, 2003,
Dyson reported to Nurse Abston with a complaint of nasal sores and
a sore behind his ear, which was swollen and red. (Id.) He was
given an antibiotic.

In his deposition, Dyson testified that he was bitten on the
right thigh by a brown recluse spider sometime in 2002. (ECF No.
270-12, Dyson Dep. at 15-16, 39.) He was treated for the wound.
(Id. at 17-18.) He claimed that the bite on his thigh later
"traveled" to his nose. (Id. at 16-17.) Later, he was bitten
inside his nose. (Id. at 19; 40-41.) The wounds healed. (Id. at
20, 39.) He testified that he told "the whole staff" about being
bitten by a spider. (Id. at 21.) He claimed that "half the time"
the medical staff would not see him, without specifying the
circumstances in which he was allegedly denied treatment. (Id. at
17.)

In Dyson's SMF, he states that he received treatment and had
surgery for his spider bite and was put on antibiotics; he filed a
grievance in 2001 about being bitten by a brown recluse spider; and
he complained to his counselor at the penal farm about his spider
bites. (ECF No. 270-2 at 52.) In his Supplemental Response, Dyson

states that he verbally complained about a spider bite to "a corrections officer" on February 22, 2003, although he could not remember the officer's name or the outcome of the grievance. (ECF No. 288 at 4; ECF 287 at 321.)  As for the injury caused by the spider bites, Dyson states that "I received treatment and had surgery for my spider bite and was put on antibiotic[s] to no avail." (ECF No. 287 at 322.)  He does not claim any mental or emotional injuries caused by the spider bites or his medical treatment. (<u>Id.</u>)

   9.  <u>Tim Edwards</u>

   The medical records show that Tim Edwards was seen by Dr. Obi-Okoye on October 7, 2003, and complained of a burning sensation when urinating, a boil on his neck, chest pain on the left side, constipation, and a spider bite on his right leg. (ECF No. 250-2 at 1.)  On October 10, he was seen by Dr. Obi-Okoye, who noted that the lesion on his right leg was healing. (<u>Id.</u> at 3.)  On October 15, he had a dressing change following a medical procedure at the Med. (<u>Id.</u> at 4.)  The records do not describe the exact procedure he underwent at the Med.  The nurse noted "wound is a 5 cm circular area with appearance of a second degree burn.  Tissue is red with a tiny area of what looks like purulent matter, but not draining.  Some loose, dark skin was easily moved off of the wound." (<u>Id.</u>)  He was seen by Dr. Obi-Okoye for a dressing change on October 16, when it was noted that the lesion was healing. (<u>Id.</u> at 6.)  On

October 18, he had his dressing changed. (Id. at 7.) On October
20, he was seen by Dr. Obi-Okoye for a follow-up exam, and she
noted the lesion was healing "with good granulation tissue." (Id.
at 8.) He was given ibuprofen and antibiotics. He was seen for
follow-up exams and/or dressing changes on October 21, November 1,
6, 10, 11, 15, 17, 18, 19, 21, 23, 24, 26, and 28, and December 3,
2003.

In Edwards's SMF, he states he was bitten on the leg by a
brown recluse spider; he has severe permanent scarring; he went to
the Med on or about October 7, 2003, on two occasions; and during
November and December of 2003, he was treated seven days a week
with antibiotics and had a bandage change every day for sixty days.
(ECF No. 270-2 at 53.) In his Supplemental Response, Edwards
states that he filed a grievance on May 5, 2002.[23] (ECF No. 288 at
5; ECF No. 287 at 328-29.) He also states that he went to the Med
on December 7, 2003. (ECF No. 288 at 5.) However, the medical
records do not show that Edwards was ever seen at the Med on or
about December 7, nor has Edwards asserted that this December 7
visit was related in any way to spider bites. In his interrogatory
responses, Edwards does not claim any mental or emotional injuries
caused by the spider bite or his medical treatment. He also does

_____

[23]The court notes that the grievance filed concerns his complaint
of not having a counselor for "P Building," and makes no mention of
spider bites or an alleged delay in medical treatment. (ECF No.
149-7 at 7.)

not provide any evidence regarding the exact date of his alleged spider bites, whether he ever submitted a medical request form or made a verbal request for treatment to SCCC or CMS employees, or allege any delays in receiving medical treatment for his injuries.

        10.  <u>Andre Giden</u>

        According to the medical records, Andre Giden was seen on September 1, 2002, by Nurse Sharon Piat, and complained of spider bites on his right hip, which he said happened a week earlier. (ECF No. 270-2 at 25.)  The nurse noted that Giden had a "quarter size" area of necrotic tissue and drainage.  (<u>Id.</u>)  The nurse cleaned the area and called Nurse Abston, who placed Giden on ibuprofen and antibiotics.  (<u>Id.</u>)  On September 5, he was seen by Dr. Obi-Okoye, for a follow-up exam and was assessed with a "spider bite lesion on right thigh area."  (<u>Id.</u> at 26.)  On October 10, 2002, Giden was seen by Dr. Obi-Okoye for a complaint of a possible spider bite on his right hip that he noticed the day before.  (<u>Id.</u> at 27.)  The doctor indicated "no bite marks noted," assessed him with cellulitis, and gave him ibuprofen and antibiotics.  (<u>Id.</u>)  On October 11, he was seen by Dr. Obi-Okoye for a follow-up exam, who noted "left hip cellulitis/abscess" and cleaned out the pus area. (<u>Id.</u> at 28.)  On July 7, 2003, Giden was seen by Dr. Obi-Okoye, and complained of a possible spider bite on the left side of his chest. (ECF No. 251-2 at 1.)  The doctor's assessment was a "spider bite abscess left thoracic area," measured at 1 cm x 1 cm.  (<u>Id.</u>)  The

area was cleaned and he was given ibuprofen, pain medication, and antibiotics. (<u>Id.</u> at 3.) His dressing was changed on July 8, he had a follow-up exam and dressing change on July 11 (when Dr. Obi-Okoye noted the lesion was resolving), and his dressing was changed on July 12 and 16.

In Giden's SMF, he states he was bitten five times at SCCC. (ECF No. 269-2 at 16; 270-2 at 53.) However, according to Giden's Supplemental Response, he was bitten four times. (ECF No. 288 at 5; ECF No. 287 at 268-69.) He states that he was bitten on his hip in April 2002; under his right arm and hip in August/September 2002; under his left arm sometime in 2003; and on the nose sometime in 2003, possibly in June. (ECF No. 287 at 268-69.) However, he did not file any grievances relating to any of these incidents. (ECF No. 287 at 335.) Giden has not presented any evidence that he ever requested treatment that was delayed.

11. <u>Nico Gilkey</u>

According to the medical records, Nico Gilkey was seen on March 13, 2002, by Nurse Katheryn Stewart, and complained of a spider bite which he noticed the day before. (ECF No. 270-2 at 22.) The nurse noted a 0.5 inch hard knot on the left side of Gilkey's neck, raised with a white center, and assessed it as an insect bite. (<u>Id.</u>) He was given ibuprofen, and the nurse referred him to Dr. Obi-Okoye for further evaluation. On March 14, he was seen by Dr. Obi-Okoye, who assessed the condition as a furuncle.

(Id. at 23.)  On March 15, Nurse Carol Bray saw Gilkey on a complaint of a spider bite under his chin.  (Id. at 24.)  The nurse told him that the doctor said it was a furuncle.  (Id.)  On January 23, 2003, Gilkey saw Nurse Katherine Byrd and stated that he was bitten by a spider and needed to be seen.  (ECF No. 252-2 at 1.)  The nurse noted a small, firm area of erythema but was unable to express any pus from the area.  On January 24, he was seen by Nurse Abston and complained of a bite on his inner thigh.  (Id. at 2.)  Nurse Abston noted a "3" diameter swollen area that is warm to the touch," and assessed the condition as an abscess with cellulitis.  (Id.)  He gave Gilkey ibuprofen and antibiotics.  On January 27, Gilkey was seen by Nurse Abston for a follow-up exam, at which time the nurse noted that the lesion had been draining.  (Id. at 3.)  On February 24, 2003, he was seen by Nurse Abston for a sore on his right leg, which the nurse assessed as folliculitis which was resolving.  (Id. at 7.)  On February 28, he was seen by Nurse Abston for a complaint of a spider bite.  (Id. at 8.)  The nurse noted a small pustular lesion on the right forearm and two indurated areas (non-pustular) on his right thigh, and assessed the condition as folliculitis.  (Id. at 8.)  The nurse gave Gilkey antibiotics.  On March 10, 2003, he was seen by Nurse Abston and complained of several sores "all over my body that I think may be spider bites."  (Id. at 10.)  The nurse noted lesions over multiple areas of his body that were dry and crusted but had no pus

drainage.  He assessed the condition as folliculitis.  (<u>Id.</u>)

Gilkey testified at this deposition that he was bitten by a spider on his leg sometime in 2000.  (ECF No. 270-7, Gilkey Dep. at 21, 24, 71.)  Medical request forms are placed in a drop box, and nurses come around once a day to pick up the forms.  (<u>Id.</u> at 23.)  He testified that it would normally take three days after turning in a medical request form to be seen by the medical staff.  (<u>Id.</u> at 79.)  He submitted a medical request form and was seen by a nurse and doctor three days later, was told that it was a boil, and received treatment with antibiotics.  (<u>Id.</u> at 23, 25-26.)  A week later, the wound dried up and he no longer experienced pain.  (<u>Id.</u> at 27, 29.)  About six weeks later, he saw the doctor, complained that the treated area was itchy, and received an antibiotic ointment.  (<u>Id.</u> at 30.)  Sometime toward the end of 2001 or early 2002, he was placed in a lockdown cell, at which time he saw spiders "everywhere" and later noticed "little white bumps" on his legs, arms, and chest.  (<u>Id.</u> at 33-34, 77.)  He asked officers if he could change cells, but was only told "I'll see what I can do." (<u>Id.</u> at 33.)  He spent thirty days in the lockdown cell, during which time the nurses checked on his once a week.  (<u>Id.</u> at 33, 35.) He told the nurses about the bites, but they allegedly told him they were not spider bites and gave him antibiotics and ointment, which resolved the condition within one week.  (<u>Id.</u> 34-36.)  Once the bites cleared up, he no longer experienced any pain.  (<u>Id.</u> at

37.) He testified that he was bitten on other occasions, but did not recall the details of those incidents. (Id. at 37, 72-77.) He does not experience any physical or emotional pain from the spider bites. (Id. at 41.) Gilkey further testified that on March 13, 2002, he was bitten by a brown recluse spider on his neck while in the "H Building." (Id. at 69-70.) He did not file any grievances relating to the spider bites or his medical care. (Id. at 61, 64.)

According to Gilkey's SMF, he was bitten on his right leg above the knee, and immediately reported to the medical unit. (ECF No. 269-2 at 16.) The medical staff told him it was a boil and gave him no treatment. (Id.) The bite became infected and swollen. (Id.) He was eventually given a shot and antibiotics. He claims that he has scarring from the bite and has a fear of spiders. (Id.)

12. Timothy Greer

The medical records show that on July 30, 2003, Timothy Greer went to the medical unit and complained of bumps on his right forearm. The condition was assessed as folliculitis.[24] (Cleveland Dep. at 98-99.) Greer was seen on September 25, 2003, by Nurse Piat, and he complained of a spider bite on his right buttock. (ECF No. 253-2 at 1.) The nurse noted a "moderate size area of

---

[24]Greer also states in his response that he was seen on July 30, 2003, for a spider bite on his forearm. (ECF No. 270-2 at 24.) However, no medical records or other supporting evidence relating to this complaint were attached to his response.

induration and inflammation on right buttocks near anus."[25]  (Id.)
He was given ibuprofen and was placed on Dr. Obi-Okoye's sick call
list for the next day.  The records from September 26 indicate he
was a "no show" for the medical appointment.  (Id. at 2.)  On
September 27, a nurse "removed core from buttock" and cleaned the
wound.  (Id. at 3.)  He was seen for a dressing change on October
1 and 2, 2003, and was given ibuprofen and antibiotics.  (Id. at
6.) On October 2, he was seen by Dr. Obi-Okoye, who assessed Greer
with a furuncle on his right buttock and noted that the lesion was
still draining fluid.  (Id. at 6.)  On October 8, he was seen by
Dr. Obi-Okoye, who noted that the furuncle was resolving and that
the lesion was smaller in size.  (Id. at 8.)  He was seen by Nurse
Abston on October 30, who observed a sore on Greer's left buttock
and assessed the condition as a "boil/insect bite-infected."  (Id.
at 9.)  He was given ibuprofen and antibiotics.  On November 3,
2003, Greer was seen by Nurse Abston for a follow-up appointment,
at which time it noted that the "lesion has been draining" and
"site looks good."  (Id. at 10.)  On November 7, Nurse Abston
examined Greer and noted that the "lesion on right upper buttock is
healing well."  (Id. at 11.)

Greer testified at his deposition that in 2003, he felt a

_____

[25]Dr. Cleveland opined that the condition reported by Greer was the
"beginning of an early perirectal or perianal abscess rather than
a spider bite."  (Cleveland Dep. at 101.)  He testified that the
location near the anus "would be very unusual for a spider to have
access to."  (Id.)

"little sting" while sleeping and his buttock area started to swell the next day. (ECF No. 270-5, Greer Dep. at 20, 22.) He saw a dead spider in his bed, which had a darkish brown color. (<u>Id.</u> at 21.) He submitted a medical request form, but was not seen by the medical staff for "six to eight days." (<u>Id.</u> at 22, 45.) He testified that he was not able to see the nurse until he complained to an SCCC counselor, who took him to the medical unit. (<u>Id.</u> at 56.) He testified that he was bitten by a spider a second time, this time on his arm, although he could not recall when it happened. (<u>Id.</u> at 25-26.) He was seen by the medical unit and was treated with antibiotics. (<u>Id.</u> at 26.) The bite cleared up within the next few days. (<u>Id.</u>) His only complaint about the medical treatment he received was that he had to submit more than one request before he could see the medical staff.[26] (<u>Id.</u> at 27.)

    13.  <u>Randy Johnson</u>[27]

    According to the medical records, Randy Johnson was admitted to the Med on September 4, 2002, after complaining that he had multiple lesions and that he had been bitten by a brown recluse

_____

[26]He testified that he was advised of SCCC's grievance procedures during orientation and was fully aware of the grievance process. (<u>Id.</u> at 38-39.) He only filed a grievance about an unrelated leg injury; he did not file a grievance about the spider bites. (<u>Id.</u> 40, 57-58.)

[27]Because Johnson's only claim is based on a single injury that occurred on September 4, 2002, the court's 2012 Ruling (as explained below) granted summary judgment for Shelby County and CMS on Johnson's claim as being barred by the one-year statute of limitations.

spider.[28] (Cleveland Dep. 106; ECF No. 254-2 at 1.) His right fifth finger was incised and drained, and he was treated with antibiotics. (Id. 108.) Dr. Cleveland testified that "[m]ore likely than not they were not spider bites." (Id. 109-110.) He supported his opinion as follows:

> [I]t is very unusual to have multiple lesions or multiple . . . spider bites simultaneously. Usually, they're a solitary lesion. At The Med, the lesions were cultured and grew methicillin resistant Staphylococcus, R S, which is the classic organism that causes multiple skin lesions or abscesses or furuncles or boils. And, again, spider bites are typically not found on the hands and fingers although they can be. So location on the hand, multiple lesions and the fact that the classic organism for multiple cutaneous skin infections were isolated all make it much less likely to have been a spider bite rather than staphylococcal lesions.

(Id. 110.)

In Johnson's Supplemental Response, he states that he was seen for a spider bite by the medical unit on September 4, 2002, and that this was the only spider bite incident claimed by him. (ECF No. 288 at 6).

14. Antonio Lipsey

Antonio Lipsey's medical records show that he was seen on April 7, 2003, for a boil under his arm. (ECF No. 270-2 at 19). The nurse noted a "3 cm round nodule" with no redness or drainage,

---

[28]Johnson's medical records from the Med, other than the single page found at ECF No. 254-2, are not attached as exhibits to either defendants' motions or the plaintiffs' response. However, Dr. Cleveland was questioned about these additional medical records at his deposition.

and he was treated with ibuprofen. (Id.) On April 8, he was seen by Dr. Obi-Okoye, who treated Lipsey with antibiotics. (Id. at 20). He was seen again on June 11, 2003, by Dr. Obi-Okoye, who assessed him with furuncles under both arms. (Id. at 21.) He was treated with ibuprofen and antibiotics. (Id.) He was seen on July 11, 2003, by Nurse Abston, and complained of a spider bite on his leg. (ECF No. 255-2 at 1.) The nurse assessed the condition as a furuncle, and treated him with ibuprofen and antibiotics. He had dressing changes on July 12, 13, 14, and 16. On July 16, Nurse Abston examined Lipsey and noted that the furuncle was resolving. (Id. at 6.) On August 13, 2003, he was seen by Nurse Bray and complained of a spider bite. (Id. at 13.) The nurse assessed the condition as folliculitis. On August 27, he complained to Nurse Abston of a spider bite, which the nurse assessed as folliculitis. (Id. at 15.) On September 2, 2003, he was seen by Nurse Bray and complained of a spider bite. (Id. at 22.) The nurse observed a lesion on his right knee, assessed the condition as a boil, and gave him antibiotics. His dressing was changed on September 5. On September 13, he complained to Nurse Susan Sing of a spider bite on his right leg. (Id. at 27.) The nurse observed a small red wound on his right knee and a small amount of drainage. He was seen by Nurse Abston on September 15, who noted a lesion on Lipsey's knee, which the nurse assessed as a boil/abscess. (Id. at 28.) He was given ibuprofen and antibiotics. His dressing was changed on

September 20.  He was seen by Nurse Abston on September 22, who noted that the lesion was healing well.  (Id. at 31.)  On October 8, 2003, Lipsey saw Nurse Abston and complained of a spider bite, and he was given antibiotics.  (Id. at 34.)  On October 23, he was seen by Nurse Abston and complained of a spider bite.  (Id. at 40.) The nurse observed a lesion on his chest that had ruptured and was draining.  He was given ibuprofen, antibiotics, and hydrocortisone cream.  On October 29, he was seen by Nurse Abston, who noted a rash.[29]  (Id. at 42.)

In his Supplemental Response, Lipsey states that he filled out a medical request form on November 11, 2003, and that he filed a grievance on February 19, 2002.  (ECF No. 288 at 7; ECF No. 149-7 at 13-14.)  The November 11 form is not a medical request form, but rather is a Shelby County "Release From Liability" form, in which Lipsey agreed to be interviewed by his former attorney, Paul Leitch.  The February 19 grievance relates to allegations of harassment by an officer, and does not relate to spider bites or medical treatment.

15.  Johnny Maxwell

According to the medical records, Johnny Maxwell was seen by Nurse Mary White-Landa on May 3, 2002, and complained of a spider bite on his right knee.  (ECF No. 270-2 at 4.)  On June 26, 2002,

_____

[29]The deposition of Pearlie Mae Lipsey for the most part contains inadmissible hearsay testimony and is not material to the matters before the court.

he saw Nurse Adrienne Askew, and stated that he had several spider bites on the lower part of his body and that he was in pain.  (<u>Id.</u> at 5.)  The nurse observed two large swollen bites on both thighs. She cleaned the area, applied gauze, and gave him ibuprofen and antibiotics.  He saw Dr. Obi-Okoye on June 27, who observed lesions discharging pus and assessed his condition as spider bites.  (<u>Id.</u> at 7.)  On July 29, 2002, he saw Nurse Abston and complained of a spider bite on his left hip.  (<u>Id.</u> at 10.)  The nurse assessed the condition as a furuncle and gave him ibuprofen and antibiotics.  On August 2, his dressing was changed.  On August 5, he saw Nurse Abston and complained of a spider bite.  (<u>Id.</u> at 16.)  The nurse observed a lesion on the right thigh and a lesion on the left thigh.  He assessed the condition as a spider bite.  His dressing was changed on August 11, at which time it was noted that the wound was healing well.  On December 13, 2002, he saw Dr. Obi-Okoye for a boil on his right ear, which he said he noticed four days earlier.  (<u>Id.</u> at 18.)  The doctor assessed the condition as a furuncle, and gave him ibuprofen and antibiotics.  On June 20, 2003, he saw Nurse Abston on a complaint of a spider bite behind his left ear.  (ECF No. 256-2 at 1.)  The nurse assessed the condition as folliculitis, and expressed a small amount of pus from the affected area.

In Maxwell's SMF, he states he "did a lot of complaining to a number of officers concerning his mistreatment and about his spider

bite," without any details regarding the nature of the complaints, such as when and to whom he made those complaints. (ECF No. 270-2 at 60.) In his Supplemental Response, Maxwell states that he was bitten four time between 2000 and 2002 on his legs. (ECF No. 288 at 7; ECF No. 287 at 361.) He states he complained to guards and others about his spider bites. (ECF No. 287 at 361.) He also states that he was seen after two weeks and was told by the doctor that he was bitten by a brown recluse spider. (<u>Id.</u>) However, Maxwell does not provide any details regarding whether and when he submitted a medical request form, or any delays in receiving medical treatment. Maxwell never filed a complaint or grievance relating to his spider bites. (<u>Id.</u> at 360.)

    16. <u>William Ohman</u>

    William Ohman's medical records reveal that he was seen on September 27, 2003, by Nurse Gloria Scott, and complained of a spider bite on the right side of his neck. (ECF No. 257-2 at 1.) He was given pain medication. On September 29, he saw Nurse Abston, who observed a swollen lesion on his neck and assessed the condition as an abscess. (<u>Id.</u> at 2.) The nurse gave Ohman pain medication and antibiotics. Ohman saw Nurse Abston on October 1, 2003, at which time the nurse noted that the lesion remained swollen and had not yet drained. (<u>Id.</u> at 3.) Ohman was given ibuprofen, pain medication, and antibiotics. On October 6, Nurse Abston examined Ohman and observed that the lesion was much better

and that the boil/abscess was resolving.  (Id. at 5.)

In his SMF, he states he filed a grievance about being bitten by spiders and that it took two days to see a doctor; he gave his complaint to a "Ms. Jones," the counselor on duty; he did not know the outcome of the complaint because he was transferred to another facility; he was moved due to his grievance and his complaints about the spider bites and poor medical treatment; and he was given fifteen different types of pills for about three to four weeks, in addition to shots.  (ECF No. 270-2 at 61; ECF No. 287 at 368.)  In his Supplemental Response, Ohman claims that he has two scars on his right shoulder and on the right side of his neck.  (ECF No. 287 at 369.)  He also states that he has an "inferiority complex" due to the scar on his neck and that he is "terrified of spiders." (Id.)

### 17.  Elton Rubin

According to the medical records, on May 2, 2003, Elton Rubin saw Nurse Piat for an "apparent spider bite," which he said happened three days earlier.  (ECF No. 258-2 at 1.)  The nurse observed a lesion on his right underarm.  She called Dr. Obi-Okoye, who placed Rubin on ibuprofen and antibiotics.  He saw the medical staff approximately eight more times following his May 2 examination, but did not complain of any further complications from the lesion.  On May 27, he saw Nurse Piat and complained of a spider bite on his buttocks.  (Id. at 11.)  He was given ibuprofen

-41-

and was placed on the sick call list.  On May 28, he saw Dr. Obi-Okoye, and complained of a spider bite on his right buttock and right underarm.  (Id. at 12.)  The doctor assessed the condition on his right buttock as cellulitis secondary to spider bites, and the condition on his right underarm as furuncles.  He was continued on ibuprofen and antibiotics.  His dressing was changed on May 29.  On July 2, 2003, he was seen by Dr. Obi-Okoye for a spider bite on his left buttock.  (Id. at 14.)  He saw Dr. Obi-Okoye on August 4, 2003, and complained of a spider bite on the right side of his chest, which he said happened three to four days earlier.  (Id. at 18.)  The doctor assessed his condition as cellulitis.  He was treated with ibuprofen, pain medication, and antibiotics.  On August 6, he saw Dr. Obi-Okoye for a follow-up exam, and had no new complaints.  (Id. at 21.)  The doctor observed that the lesion on the right chest wall was filled with pus and was draining, and "presence of necrotic tissue surrounded by areas of erythema."  He saw Dr. Obi-Okoye on August 8, at which time the doctor noted "spider bite cellulitis-resolving." (Id. at 23.)  His dressing was changed on August 9 and 10, and he was seen by Dr. Obi-Okoye on August 11 for a follow-up exam.  She noted that the lesion was healing well and was no longer draining pus.  (Id. at 30.)

At his deposition, Rubin testified that he was bitten multiple times by spiders.  (ECF No. 270-10, Rubin Dep. at 19.)  He was bitten by a spider on February 14, 2002, at SCCC in Building H (the

alcohol drug facility). (<u>Id.</u> at 21.) He testified he was "paralyzed" by the bite and was not seen by the medical staff until three days later. (<u>Id.</u> at 16.) He testified that he was bitten a second time by a spider on February 17, 2002, on his right arm pit. (<u>Id.</u> at 21.) Rubin experienced his third spider bite on October 7, 2003, on the right side of his chest. (<u>Id.</u> at 23.) Rubin later testified that he was bitten by a spider on May 27, 2003 and August 4, 2003. (<u>Id.</u> at 43, 45.) On the August 4 incident, he testified that the affected area was the "size of a softball and it had a head on it the size of a ping-pong ball." (<u>Id.</u> at 45.) Rubin's only complaint related to the first two bites, in that he believes he was not seen fast enough by the medical staff. (<u>Id.</u> at 25.)

In his Supplemental Response, Rubin states that on October 7, 2003, he filed a grievance for a request for medical records. (ECF No. 287 at 374.) He also states generally that he was "bitten and he made verbal complaints and filled out medical grievance forms," although he does not describe the nature of these grievances. (<u>Id.</u>) As discussed in <u>Order II</u>, Rubin did not file a grievance as required by the PLRA. He testified that he filed a grievance regarding complaints about eyeglasses and to get his medical records, but he did not file a grievance relating to any of the spider bite incidents. (<u>Id.</u> 37, 54.)

18. <u>Tony Sanders</u>

On February 26, 2003, Tony Sanders was seen by Linda Kelly, a

nurse practitioner, and complained that he had a spider bite on his right knee, which he said happened four days earlier. (ECF No. 259-2 at 3.) He was given ibuprofen and antibiotics. His dressing was changed on February 28. On March 1, 2003, he had another dressing change, at which time it was noted that the wound on his right knee had a slight amount of drainage. (Id. at 9.) He had a follow-up exam on March 3 and his dressing was changed on March 3, 5, and 7.[30] On April 6, 2003, he saw Nurse Tabitha Warren, and complained of two boils on his upper thigh and one boil in his groin. (Id. at 24.) The nurse called Dr. Obi-Okoye, who placed him on ibuprofen and antibiotics. On May 13, 2003, he saw Nurse Abston and complained of a spider bite on his right torso, which he said happened three days earlier. (Id. at 28.) The nurse assessed the condition as a furuncle and gave him ibuprofen and antibiotics. On July 7, 2003, he was seen by Dr. Obi-Okoye and complained of a spider bite on his left knee, which he said happened seven days earlier. (Id. at 39.) He was given ibuprofen, antibiotics, and other medication. His dressing was changed on July 8. He saw Dr. Obi-Okoye on July 10 for a follow-up exam, and she noted the lesion was scabbing over and the swelling had resolved. (Id. at 42.) His dressing was changed on July 10, 12, 14, 16, 17, 20, and 21. On

---

[30]During this time, he was seen by a mental health professional, who diagnosed Sanders with Schizophrenia, paranoid type. (Id. at 21.) Sanders stated that he heard voices that come and go. (Id. at 34.) He also has a long history of seizures.

November 4, 2003, he saw Nurse Abston and complained of a spider bite. (<u>Id.</u> at 62.) The nurse observed a lesion on his chin and assessed the condition as an abscess with cellulitis. He was given ibuprofen and antibiotics. On November 6, Nurse Abston examined Sanders on a follow-up visit and observed that the lesion had enlarged and was "grossly swollen." (<u>Id.</u> at 63.) He discussed the situation with Dr. Obi-Okoye, and Sanders was sent to the Med. The doctor's assessment at the Med was that Sanders had an allergic reaction. (<u>Id.</u> at 65.) On November 14, he saw Dr. Obi-Okoye, who noted that the abscess on his lip had resolved. (<u>Id.</u> at 66.)

Sander testified at this deposition that he was bitten by spiders on multiple occasions. (ECF No. 270-11, Sanders Dep. at 18, 23, 72.) He testified that he tried to go to the Med, but that unknown officers would not let him go. (<u>Id.</u> at 19.) He was seen five or six days later by the medical staff at SCCC. (<u>Id.</u> at 20.) He testified that the bite later became infected, which required him to go to the Med to have the affected area lanced. (<u>Id.</u> at 22.) Sanders testified that when he was bitten on the left thigh by a spider, he went into a seizure. (<u>Id.</u> at 23, 72.) He testified that he stayed in the cell for about a week before he could see the medical staff. (<u>Id.</u> at 24.) He testified that he was given some "wrong medicine," which caused an allergic reaction, and that he was rushed to the hospital and then to the Med. (<u>Id.</u> at 25-26.) He testified that the medical staff was

-45-

"unprofessional" because when they were busy, they would send him back to his cell without changing his dressing. (Id. at 70-71.) This happened to him on at least two occasions. (Id. at 85.)

    19.  Christopher Winston

    Christopher Winston saw Dr. Obi-Okoye on April 7, 2003, and complained of a "possible spider bite x 2 days, on his left thigh." (ECF No. 260-2 at 1.)  The doctor observed a healing lesion on his thigh and assessed the condition as cellulitis.  She gave him ibuprofen and antibiotics.  On April 17, he was examined by Nurse Byrd, who observed that the wound had healed and no problems were noted.  (Id. at 5.)  On April 18, he saw Dr. Obi-Okoye, at which time she determined that the lesion on Winston's thigh had completely healed.  (Id. at 6.)

    Winston testified at his deposition that he was bitten in 2003 by a spider on two separate occasions (although the medical records only show treatment for one alleged spider bite incident).  (ECF No. 270-9, Winston Dep. at 15.)  He was first bitten on his left leg, was treated at the medical unit the next day, and then returned to his cell.  (Id. at 15, 17.)  Later, he was bitten on the right leg by a spider.  (Id.)  He brought the spider to the doctor to prove that he had been bitten by a spider.  (Id.)  He described the spider as brown in color.  (Id. at 18-19).

    20.  Shelby County's Supplemental Filing

    Attached to Shelby County's supplemental filing (ECF No. 293),

is the Affidavit of James E. Coleman, the Director of the Shelby County Division of Corrections. Director Coleman states in relevant part as follows:

3.    When inmates are accepted into the SCCC, they are informed of, among many things, their right to medical care and the grievance process. They are provided that information orally and in writing through the inmate handbook.

4.    I have reviewed the former medical provider's Policy and Procedure No. 37.00, effective November 20, 1998 . . . . The Policy and Procedure provides that non-emergency healthcare will be provided pursuant to written Health Services Request Forms, which are provided in each housing unit and collected daily and triaged by health care staff. . . .

5.    SCCC had a Medical Co-Pay policy, effective February 1, 2002, a copy of which is attached as Exhibit C. It provide[s] for such things as sick calls, walk-in visits, return visits, responses to medical emergencies.

6.    Health Services Request Forms are also known as "sick call" requests. State and federal law prohibits SCCC personnel from having access to inmates' medical conditions/treatment. SCCC is compliant with all applicable HIPAA statutes.

7.    Sick call requests were not and are not received, viewed, or transmitted by SCCC personnel to health care providers. If an inmate orally expressed a medical need or concern to SCCC personnel, the inmate would be instructed to submit a sick call request although, depending on the nature of the need or concern, SCCC personnel might contact medical personnel to convey the information. Occasionally that [] is done to schedule a walk-in visit. If the inmate has an emergent medical need[], that will be communicated so that medical personnel may respond on an immediate basis.

8.    If an inmate raises concerns about his health care through a grievance, SCCC personnel are allowed access to the medical records to the extent necessary to respond to the grievance. A grievance is the proper mechanism to be used by inmates to notify SCCC personnel that CMS is

alleged to be unresponsive to inmates' medical needs. Once such a grievance is filed, SCCC personnel will investigate the allegations and take corrective action if warranted.

9.    It is and was the policy and practice of the SCCC to respond promptly to the medical requests and needs of inmates.    SCCC employees who fail to respond appropriately are and were subject to discipline and employees are aware that such conduct will not be tolerated.

(Id. ¶ 7.)    CMS's Health Services Division Policy & Procedure Manual, attached as Exhibit B to Shelby County's supplemental filing, provides the following procedures for non-emergency medical requests:

Policy:

1.    Inmates of the institution will have access to non-emergency healthcare by submitting a written request that is triaged by a qualified healthcare staff member on a daily basis.

2.    A designated healthcare staff member will make rounds in segregation areas daily to solicit healthcare requests from segregated inmates.

Procedures:

1.    An approved Health Services Request Form will be provided in each housing unit.

2.    Segregation rounds will be documented on security log.

3.    Written requests will be collected daily at scheduled times in each housing unit.  Request forms will be stamped with date of receipt and retained for potential retrieval.

4.    Triage decision, or inmate assessment, will be documented on Health Services Request Form or Medical Record.

-48-

5.    Any inmate with a request suggesting the problem may
be of an emergent nature (i.e. chest pain) will receive
prompt attention.

6.    Non-emergency requests will be scheduled for
appropriate level sick call.

7.    A Sick Call Log of all inmates who have requested
healthcare will be prepared.

8.    Sick Call Log will be placed in designated area for
Medical Record retrieval, in preparation for sick call.

9.    Arrangements for inmate movement will be made in
accordance with institutional procedures.

(ECF No. 293-1.)

## II.    ANALYSIS

### A.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that

A party may move for summary judgment, identifying each
claim or defense – or the part of each claim or defense –
on which summary judgment is sought.  The court shall
grant summary judgment if the movant shows that there is
no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317,

322 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms., Inc., 862

F.2d 597, 601 (6th Cir. 1988).  In reviewing a motion for summary

judgment, the evidence must be viewed in the light most favorable

to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986).  When the motion is

supported by proof such as depositions and affidavits, the

nonmoving party may not rest on his pleadings, but rather he must

present some "specific facts showing that there is a genuine issue

-49-

for trial." <u>Celotex</u>, 477 U.S. at 324. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.

As an initial matter, the court will explain its basis for dismissing plaintiff Randy Johnson's claims on statute of limitations grounds in the 2012 Ruling. The court also finds, consistent with its ruling in <u>Order II</u>, that the 2001 claim for injuries brought by Tyrone Dyson and the May 2002 claim for injuries brought by Tim Edwards are time-barred. Previously, in <u>Order II</u>, the court granted summary judgment in favor of Shelby County based, in part, on the determination that all causes of action in this case that accrued more than one year before the October 29, 2003 amended complaint are barred by the statute of limitations. (ECF No. 274 at 9.) During discovery, Shelby County served the following interrogatories on the plaintiffs:

INTERROGATORY NO. 6: Have you ever filed or lodged a grievance or complaint against a corrections' employee or

a correctional facility? . . . .

INTERROGATORY NO. 7: Did you file a grievance in connection with the incident that is the subject of your complaint? . . . .

INTERROGATORY NO. 8: For every illness, disease, injury or other affliction and every physical disability, impairment or handicap that Plaintiff alleges to have resulted from the alleged spider bites as alleged in his complaint, please state the nature and extent of such illness, disease, injury, affliction or physical or mental disability . . . .

Johnson responded that he had filed a grievance complaining that he was denied medical treatment with respect to a spider bite. He indicated that he was in the hospital for eight days following surgery as a result of the spider bite. His response did not indicate a specific date of his hospitalization, but the response stated that it was "the only time I has [sic] ever been hospitalized, so records should be easily available to the Defendant." (D.E. 261-4.) Johnson's medical records show that he was hospitalized on September 4, 2002. (D.E. 254-2.) Other than this single event, Johnson has alleged no other injuries. Dyson, in his SMF, has claimed that he filed a grievance sometime in 2001 regarding being bitten by a spider, but has provided no details about that event. Edwards, in his Supplemental Response, has claimed that he filed a grievance on May 5, 2002, although the grievance related to not having a counselor for "P Building," and made no mention of spider bites or medical treatment.

The Sixth Circuit has held that "in all actions brought under

§ 1983 alleging violations of civil rights or personal injuries, the state statute of limitations governing actions for personal injuries is to be applied." <u>Brandt v. Tennessee</u>, 796 F.2d 879, 883 (6th Cir. 1986); <u>see also</u> <u>Frasure v. Shelby Cnty.</u>, 4 F. App'x 249, 250 (6th Cir. 2001). The statute of limitations for civil rights actions arising in Tennessee is one year. <u>Frasure</u>, 4 F. App'x at 250 (citing <u>Jackson v. Richards Med. Co.</u>, 961 F.2d 575, 578 (6th Cir. 1992)). As the Sixth Circuit has stated, "an amendment which adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations." <u>In re Kent Holland Die Casting & Plating, Inc.</u>, 928 F.2d 1448, 1449 (6th Cir. 1991). The rule was extended by the Sixth Circuit to bar the addition of plaintiffs, not just defendants, after the applicable statute of limitations has expired. <u>Asher v. Unarco Material Handling, Inc.</u>, 596 F.3d 313, 318 (6th Cir. 2010). In addition, the language of Rule 15(c)(1)(B) permits relation back of an amendment asserting "a claim or defense" but does not authorize the relation back of an amendment adding a new party. <u>Id.</u> Rule 15(c)(1)(C) permits limited changes in the identities of parties but only to correct misnomers or misdescriptions made in the original, timely filing. <u>In re Kent Holland</u>, 928 F.2d at 1450.

Thus, because Johnson's single September 2002 injury, Dyson's 2001 injury, and Edwards's May 2002 "injury" accrued more than one year before they were added as plaintiffs in the Amended Complaint,

these § 1983 claims are barred by the one-year statute of limitations. Similarly, their state law tort claims based on these injuries are time-barred. Tenn. Code Ann. § 28-3-104 (actions for injuries to the person shall be commenced within one year after the cause of action accrued); Tenn. Code Ann. § 29-26-116(a)(1) (one-year statute of limitations for medical malpractice claims); Leach v. Taylor, 124 S.W.3d 87, 91 (Tenn. 2004) (stating that intentional infliction of emotional distress is a personal injury tort, governed by the general one-year statute of limitations in Tenn. Code Ann. § 28-3-104). These plaintiffs have provided no basis for excusing the untimely complaint on equitable tolling grounds. For these reasons, the court grants summary judgment in favor of CMS and dismisses Johnson's claims, Dyson's 2001 claim, and Edwards's May 2002 claim.[31]

**B.    CMS**

As stated above, on January 15, January 29, and April 30, 2013, the court entered orders granting motions to dismiss filed jointly by CMS and plaintiffs Anderson, Bonds, Brown, Danner, Gilkey, Giden, Greer, Lipsey, Maxwell, Ohman, Sanders, and Winston. (ECF Nos. 297, 299, 303.) Therefore, only plaintiffs Braswell, Butler, Dyson, Edwards, and Rubin potentially have claims against CMS. The court will address the claims for these remaining

---

[31]In addition to being time-barred, the court also finds that these claims must be dismissed for the same reasons that the other plaintiffs' claims are subject to dismissal (as discussed below).

five defendants below.

1. <u>Exhaustion of Administrative Remedies Under the PLRA</u>

CMS argued that the claims of the Inmate Plaintiffs are governed by the PLRA, that the PLRA required these plaintiffs to exhaust their administrative remedies prior to filing suit under § 1983, and that CMS's motion for summary judgment should be granted as to the Inmate Plaintiffs because it has demonstrated that these plaintiffs had not exhausted their administrative remedies. As discussed in <u>Order II</u>, the Inmate Plaintiffs include, among others, plaintiffs Dyson, Edwards, and Rubin. For the same reasons stated in <u>Order II</u>, the court grants summary judgment for CMS with respect to the § 1983 claims of all Inmate Plaintiffs, including Dyson, Edwards, and Rubin, for failure to exhaust.[32] (ECF No. 274 at 10-19); <u>see also</u> <u>Reeves v. Corr. Med. Servs.</u>, No. 08-13776, 2009 WL 3876292, at *5 (E.D. Mich. Nov. 17, 2009) (holding that PLRA exhaustion requirements apply to actions against private corporations that provide correctional services, such as Correctional Medical Services) (citing <u>Alder v. Corr. Med. Servs.</u>, 73 F. App'x 839, 842 (6th Cir. 2003)).

2. <u>§ 1983 Claims Based on Medical Care</u>

CMS moved for summary judgment on the plaintiffs' § 1983

---

[32]In addition to their failure to exhaust, the court also finds that Dyson, Edwards, and Rubin's § 1983 claims must be dismissed on the merits for the same reasons that the other plaintiffs' claims are subject to dismissal (as discussed below).

claims for violations of their Eighth Amendment rights. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. CONST. Amend. VIII. The Supreme Court has held that the Eighth Amendment imposes upon prison officials the duty to "provide humane conditions of confinement," and that among the obligations attendant to the discharge of that duty is to "ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment's prohibition against cruel and unusual punishment protects against the unnecessary and wanton infliction of pain, the existence of which is evidenced by the "deliberate indifference" to an inmate's "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104-06 (1976); Napier v. Madison Cnty., Kentucky, 238 F.3d 739, 742 (6th Cir. 2001). The Eighth Amendment analysis involves two steps. First, the court must determine, under an objective standard, whether the alleged deprivation was sufficiently serious. A "serious medical need" sufficient to implicate the Eighth Amendment is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Harrison v. Ash, 539 F.3d 510, 518 (6th Cir. 2008). Second, the court must determine whether the defendant possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S.

294, 302 (1991).  This subjective component requires that the defendant act with the requisite intent, which must rise at least to the level of deliberate indifference.  Farmer, 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence."  Id. at 835; see also Lewellen v. Metro. Gov't of Nashville & Davidson Cnty., 34 F.3d 345, 348 (6th Cir. 1994); Bell v. Shelby Cnty., No. 06-2456, 2006 WL 3734421, at *3 (W.D. Tenn. Dec. 15, 2006).  Under this deliberate indifference standard,

> a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.

Farmer, 511 U.S. at 847.

To the extent, however, that a plaintiff simply disagrees with the treatment he received, or asserts that he received negligent medical care, his claim does not implicate the Eighth Amendment. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle, 429 U.S. at 106; see also Minqus v. Butler, 591 F.3d 474, 480 (6th Cir. 2010) (to prevail on an Eighth Amendment denial of medical treatment claim, "the inmate must show more than negligence or the misdiagnosis of

-56-

an ailment"); <u>Robbins v. Black</u>, 351 F. App'x 58, 62 (6th Cir. 2009) ("mere negligence or malpractice is insufficient to establish an Eighth Amendment violation"); <u>Brown v. Kashyap</u>, No. 00-1322, 2000 WL 1679462, at *1 (6th Cir. Nov. 1, 2000) ("allegations of medical malpractice or negligent diagnosis and treatment" do not implicate the Eighth Amendment); <u>Williams v. Mehra</u>, 186 F.3d 685, 691 (6th Cir. 1999) ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner").  To survive summary judgment, a plaintiff must "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  <u>Phillips v. Roane Cnty., Tenn.</u>, 534 F.3d 531, 540 (6th Cir. 2008).  Prison officials' deliberate indifference violates an inmate's rights "when the indifference is manifested by prison guards intentionally denying or delaying access to medical care for a serious medical need."  <u>Phillips</u>, 534 F.3d at 539 (quotation omitted).  This is a "stringent standard," meant to "prevent the constitutionalization of medical malpractice claims."  <u>Comstock v. McCrary,</u> 273 F.3d 693, 703 (6th Cir. 2001).  Although a plaintiff need not show that an official acted with the very purpose of causing him harm or with knowledge that harm will result, he must show more than negligence.  <u>Id.</u> (citing <u>Estelle</u>, 429 U.S. at 106).  Accordingly, the misdiagnosis of an ailment is insufficient to

establish an official's deliberate indifference. <u>Comstock</u>, 273 F.3d at 703. Indeed, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." <u>Arflack v. Cnty. of Henderson, Kentucky</u>, 412 F. App'x 829, 832 (6th Cir. 2011) (quoting <u>Westlake v. Lucas</u>, 537 F.2d 857, 860 n.5 (6th Cir. 1976)); <u>see</u> <u>Comstock</u>, 273 F.3d at 703 ("When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs.").

In this case, the court concludes that no reasonable jury could find that any of CMS's medical professionals engaged in medical malpractice because, as discussed later, the plaintiffs have not presented any of the requisite expert medical testimony necessary to support these claims. Moreover, the plaintiffs have not presented evidence that CMS, in fact, delayed in providing medical treatment once treatment was requested by the plaintiffs, nor have the plaintiffs presented any medical evidence regarding the effect of any alleged delay in receiving treatment. <u>See</u> <u>Blosser v. Gilbert</u>, 422 F. App'x 453, 460 (6th Cir. 2011) ("If a deliberate indifference claim is based on the prison's failure to treat a condition adequately, . . . a plaintiff must place verifying medical evidence in the record to establish the

detrimental effect of the delay in medical treatment.") (internal citations and quotation marks omitted). In any event, as the cases cited above demonstrate, any such isolated instances of negligence or medical practice would not amount to a constitutional violation. Thus, their § 1983 claims against CMS must fail.

However, even assuming that a constitutional violation occurred, it does not necessarily follow that CMS is liable under § 1983. A private company deemed to be acting under color of state law for purposes of § 1983 cannot be held vicariously liable for the actions of its employees on a theory of *respondeat superior*. Starcher v. Corr. Med. Sys., Inc., 7 F. App'x 459, 465 (6th Cir. 2001); Street v. Corr. Corp. of Am., 102 F.3d 810, 818 (6th Cir. 1996) (citing Harvey v. Harvey, 949 F.2d 1127, 1129-30 (11th Cir. 1992)). Instead, a plaintiff bringing a § 1983 claim against a state actor must also identify a custom or policy, or policy of inaction, that was the "moving force" behind the constitutional violation. Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 403 (1997); City of Canton v. Harris, 489 U.S. 378, 379 (1989); Perez v. Oakland Cnty., 466 F.3d 416, 430 (6th Cir. 2006). The plaintiff must demonstrate a "direct causal link" between state action and the deprivation of rights, such that the "deliberate conduct" of the state actor is the "moving force" behind the alleged constitutional violation. Waters v. City of Morristown, 242 F.3d 353, 361-62 (6th Cir. 2001).

The Sixth Circuit has identified at least four ways a plaintiff may prove the existence of a policy or custom: (1) legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005). Where, as in the present case, a plaintiff alleges that the defendant has an unwritten policy or a policy of "inaction," the plaintiff must show: (1) the existence of a "clear and persistent pattern" of illegal activity; (2) the defendant had notice or constructive notice of such; (3) the defendant tacitly approved of the illegal activity, such that "their deliberate indifference in their failure to act can be said to amount to an official policy of inaction"; and (4) the policy, practice, or custom in question was the "moving force" or "direct causal link" in the constitutional deprivation. Id. at 429.

The court, viewing all of the evidence in the light most favorable to the plaintiffs, concludes that the plaintiffs have not presented sufficient proof from which a reasonable jury could find that CMS is liable for any alleged constitutional violations. There is no evidence of a "clear and persistent pattern" of illegal activity. See Peet v. City of Detroit, 502 F.3d 557, 568 (6th Cir. 2007) ("[N]o reasonable juror could infer such a custom or policy

based on a mere three instances [of police misconduct] that are limited to one police investigation."); Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 701 (6th Cir. 2006) ("To establish deliberate indifference through these reports [of sexual abuse], Pendergrass would have had to allege and put on some evidence that two incidents of abuse over two years is an excessive number."). To the contrary, the medical records show that all of the plaintiffs were examined by health care professionals when they complained about their spider bites and other sores, they were provided with medical treatment, and they were regularly seen for follow-up appointments. While the plaintiffs may disagree with the assessments of the doctors and nurses as to whether a particular injury was caused by a spider bite or something else, they have not presented any evidence that they received improper medical care as a result of the alleged incorrect diagnoses. As Dr. Cleveland opined, "CMS, through its medical providers, did not deviate from the applicable standard of care in the treatment of plaintiffs," "CMS was, at all relevant times, addressing these plaintiffs' complaints and treating them based upon observations of plaintiffs' conditions," and "[n]o action or inaction on the part of CMS medical providers caused or contributed to any injury or harm to these plaintiffs."

Furthermore, the plaintiffs have not shown that CMS had actual or constructive notice of any inadequate or delayed medical

treatment, that CMS in any way tacitly approved of the "illegal" activity, or that the policy, practice, or custom was the "moving force" or "direct causal link" in the constitutional deprivation. As stated in Order II, "[t]he voluminous medical records of the plaintiffs produced by the defendants during discovery in this case demonstrate that every plaintiff received some level of medical treatment for their spider bites and other ailments. . . . Plaintiffs highlight instances where they allege medical treatment was delayed or denied, but the wealth of the evidence that the [parties] present indicates that they were receiving prompt and adequate medical care from CMS."

In the 2012 Ruling, the court concluded that the plaintiffs sufficiently created a genuine dispute to survive summary judgment on the issue of whether CMS had a policy of delaying medical treatment. A review of the entire medical evidence, however, demonstrates that this conclusion was clearly erroneous. Importantly, the plaintiffs (with limited exceptions, as discussed below) have not shown for any particular injury exactly when they submitted their medical request forms, or the amount of delay between when those forms were submitted and when they were able to see a medical professional. Therefore, the court amends its 2012 Ruling and grants CMS's motion for summary judgment on plaintiffs'

§ 1983 claims.[33]

3.  <u>Negligence/Medical Malpractice</u>

The elements of common law negligence include "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." <u>Giggers v. Memphis Hous. Auth.</u>, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting <u>McCall v. Wilder</u>, 913 S.W.2d 150, 153 (Tenn. 1995)).  Generally stated, a medical malpractice action is an action for damages for personal injury or death as a result of any medical malpractice by a health care provider, whether based upon tort or contract law. <u>Peete v. Shelby Cnty. Health Care Corp.</u>, 938 S.W.2d 693, 696 (Tenn. Ct. App. 1996), <u>perm. app. denied</u> (Tenn. Jan. 6, 1997).  In order to prevail on a claim of medical malpractice, a plaintiff must establish the following statutory elements: (1) the recognized standard of professional care in the specialty and locality in which the defendant practices; (2) that

---

[33]The court, in its 2012 Ruling, also noted that it was unclear, based on the record that was before the court at that time, whether Shelby County may have been responsible for any delays in notifying CMS of the inmates' request for medical treatment.  Shelby County's subsequently filed affidavit of Director Coleman and CMS's Health Services Division Policy & Procedure Manual now make clear, however, that it was CMS's responsibility to collect on a daily basis the inmates' medical request forms and to schedule a time for the inmates to be seen by a medical professional.  Therefore, the court finds no basis to revisit its prior order granting summary judgment in favor of Shelby County on the plaintiffs' § 1983 claims for inadequate medical treatment.

the defendant failed to act in accordance with the applicable standard of care; and (3) that as proximate result of the defendant's negligent act or omission, the claimant suffered an injury which otherwise would not have occurred. Tenn. Code Ann. § 29-26-115(a). In medical malpractice cases, the negligence of the defendant physician usually must be proved by expert testimony. Chambliss v. Stohler, 124 S.W.3d 116, 119 (Tenn. Ct. App. 2003). The rationale behind the expert testimony requirement stems from the complicated and technical information presented in medical malpractice cases, much of which is "beyond the general knowledge of a lay jury." Seavers v. Methodist Med. Ctr. of Oak Ridge, 9 S.W.3d 86, 92 (Tenn. 1999). "Unless the negligence is obvious and readily understandable by an average layperson, expert testimony will be required to demonstrate the applicable standard of care and breach of that standard." Barkes v. River Park Hosp., Inc., 328 S.W.3d 829, 892 n.2 (Tenn. 2010). Alternatively, no expert testimony is required in order to litigate an ordinary negligence claim. Estate of French v. Stratford House, 333 S.W.3d 546, 554 (Tenn. 2011). The determination of whether a case is an ordinary negligence case or a malpractice case is a determination of law for the court. Id. at 557. As the Supreme Court of Tennessee stated in Estate of French:

> Because medical malpractice is a category of negligence, the distinction between medical malpractice and negligence claims is subtle; there is no rigid analytical line separating the two causes of action . . . the

distinguishing feature between ordinary negligence and medical malpractice cases is whether a plaintiff's claim is for injuries resulting from negligent medical treatment. . . .

If the alleged breach of the duty of care set forth in the complaint is one that was based upon medical art or science, training, or expertise, then it is a claim for medical malpractice. If, however, the act or omission complained of is one that requires no specialized skills, and could be assessed by the trier of fact based on ordinary everyday experiences, then the claim sounds in ordinary negligence.

Id. at 555–56 (quotation marks and citations in original omitted).

Not all cases involving health or medical care automatically qualify as medical malpractice claims. Id. at 556. The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons, or whether the conduct complained of can instead be assessed on the basis of common everyday experience of the trier of fact. Id. In other words, in medical malpractice cases, courts look to whether the decision, act, or omission complained of required the assessment of a patient's medical condition and whether the decision, act, or omission required a decision based upon medical science, specialized training or skill. See Holt ex rel. Waller v. City of Memphis, No. W2000-00913-COA-R3-CV, 2001 WL 846081, at *6 (Tenn. Ct. App. July 20, 2001). Where causes of action involve complaints about acts or omissions involving medical science and expertise, they qualify as

medical malpractice cases; where they do not involve such training and knowledge, they generally sound in ordinary negligence.  <u>See generally</u> <u>Peete</u>, 938 S.W.2d 693.

The five remaining plaintiffs' claims pertain primarily to the adequacy of the medical treatment *after* they were seen by a nurse or doctor, for which expert testimony is required to demonstrate the applicable standard of care and breach of that standard.  These include plaintiffs' claims based on the providers' diagnoses and treatment, and their medical judgment as to whether any of the plaintiffs should have been seen (and if so, when) by an outside medical provider, such as the Med.  None of the plaintiffs have provided any such expert testimony.  Therefore, the court grants summary judgment in favor of CMS on the medical malpractice claims.

The court's 2012 Ruling, however, denied CMS's motions for summary judgment to the extent the plaintiffs' claims sounded in ordinary negligence based on delays in providing treatment. Assuming, *arguendo*, that the scheduling of medical appointments does not involve an assessment of a patient's medical condition based upon medical science, specialized training, or skill, the court finds that its prior ruling was nevertheless clearly erroneous.  Only three of the five remaining plaintiffs - Braswell, Butler, and Rubin - have presented any evidence regarding the amount of "delay" between when they were allegedly bitten by a spider and when they were able to see a nurse or doctor.

Specifically, (1) Braswell's medical records indicate that he saw Dr. Obi-Okoye on November 18, 2002, and reported to the doctor that he had been bitten by a spider on the nose two or three days earlier; (2) Braswell's medical records indicate that he was seen by Dr. Obi-Okoye on January 23, 2003, for a spider bite near his tailbone area, and reported to the doctor that he had been bitten five days earlier; (3) Butler's medical records and deposition testimony show that he saw a nurse within a matter of hours after being bitten by a spider; (4) Rubin's medical records show that he saw a nurse on May 2, 2003, and reported to the nurse that he had been bitten by a spider three days earlier; (5) Rubin's medical records indicate that he saw Dr. Obi-Okoye on August 4, 2003, and reported to the doctor that he had been bitten by a spider three to four days earlier; and (6) Rubin testified that he was bitten by a spider on February 14, 2002, and was not seen by the medical staff until three days later. Rubin has not provided any evidence regarding *when* he submitted his medical request form or otherwise notified CMS of his request for medical treatment. Without evidence of when he submitted his requests, Rubin cannot show any delay in obtaining medical treatment. With respect to Braswell, his Supplemental Response states that he filled out medical request forms and verbally complained to unidentified guards on January 22 and January 28, 2003. The medical records show, however, that he was seen by Dr. Obi-Okoye on January 23 and went to the Med on

January 28.  With respect to Butler, he saw a nurse within a matter of hours after being bitten by a spider.  The court concludes that no reasonable jury could find that CMS was negligent for delayed treatment under these facts.

Therefore, the court amends its 2012 Ruling and grants summary judgment in favor of CMS on the plaintiffs' negligence and medical malpractice claims, including all claims based on alleged delays in receiving medical treatment.

    4.   <u>Intentional Infliction of Emotional Distress</u>

In order for the plaintiffs to prevail on a claim for intentional infliction of emotional distress, "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury."  <u>Akers v. Prime Succession of Tenn., Inc.</u>, No. E2009-02203-COA-R3-CV, 2011 WL 4908396, at *21 (Tenn. Ct. App. Oct. 17, 2011) (quoting <u>Bain v. Wells</u>, 936 S.W.2d 618, 622 (Tenn. 1997)).  The burden to establish these elements is not easily met.  <u>Id.</u>  The Tennessee Supreme Court has adopted the high standard described by the Restatement (Second) of Torts, which states:

> [t]he cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous.  It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another

> tort. Liability has been found only where the conduct
> has been so outrageous in character, and so extreme in
> degree, as to go beyond all bounds of decency, and to be
> regarded as atrocious and utterly intolerable in a
> civilized community. Generally, the case is one in which
> the recitation of the facts to an average member of the
> community would arouse his resentment against the actor,
> and lead him to exclaim, 'Outrageous.'

Bain, 936 S.W.2d at 622-23 (quoting Medlin v. Allied Inv. Co., 217
Tenn. 469, 479 (Tenn. 1966) and RESTATEMENT (SECOND) OF TORTS § 46 cmt.
d(1965)).

The Tennessee Court of Appeals has also stated, in regard to
the third required element of intentional infliction of emotional
distress claims, that:

> serious mental injury is that in which the distress is so
> severe that no reasonable person could be expected to
> endure it. In Miller v. Willbanks, [8 S.W.3d 607 (Tenn.
> 1999)], the Tennessee Supreme Court recognized that a
> plaintiff may establish such emotional harm by several
> means, such as through the plaintiff's own testimony, lay
> witness testimony of the plaintiff's acquaintances,
> physical manifestations of emotional distress, evidence
> of nightmares, insomnia and depression, proof of
> psychiatric treatment, or evidence of the mental
> distress' intensity and duration.

Akers, 2011 WL 4908396, at *21 (internal citations and quotation
marks omitted) (quoting Levy v. Franks, 159 S.W.3d 66, 85 (Tenn.
Ct. App. 2004)). While expert testimony is not required to
demonstrate the severity of the alleged mental injury, a plaintiff
must present some evidence that his mental injury is "serious or
severe." Id. Liability only attaches when "the distress is so
severe that no reasonable [person] could be expected to endure it."
Id. (quoting Miller, 8 S.W.2d at 615 n.4).

Based on the evidence, viewed in the light most favorable to the plaintiffs, the court concludes that no reasonable jury could find in favor of any of the five remaining plaintiffs on their intentional infliction of emotional distress claims. The evidence of mental or emotional injuries to these plaintiffs include: (1) Braswell's medical records for February 13, 2003, which indicate he reported to the medical unit that he had a fear of spiders and that he was afraid to sleep for fear that spiders would bite him; (2) Braswell's interrogatory responses, in which he states that the spider bites and lack of immediate medical attention caused, among other conditions, "nightmares, irritable, afraid, paranoia stress disorder, . . . fear of sleeping because of spiders"; (3) Butler testified at his deposition that he has a fear of spiders and has nightmares, including waking up and screaming at night; and (4) Gilkey has a "fear of spiders."  Neither Dyson nor Edwards claim any mental or emotional injuries caused by the spider bites or the medical treatment they received.  Thus, only Braswell, Butler, and Gilkey have produced evidence that relates to mental or emotional injuries.

The court finds that no reasonable jury could conclude that the conduct of CMS or its employees was intentional or reckless, or that the conduct was so outrageous that it is not tolerated by civilized society.  No rational juror could find that CMS's conduct was "so outrageous in character, and so extreme in degree, as to go

beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  Therefore, the court grants summary judgment for CMS and dismisses the plaintiffs' intentional infliction of emotional distress claims.

## C.  Shelby County

The court has a "continuing duty" to dismiss any case in which a party is proceeding *in forma pauperis* if the court determines that the complaint is frivolous or malicious, fails to state a claim, or seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2)(B); 28 U.S.C. § 1915A(b); see also Alexander v. United States, No. 13-00678, 2013 WL 1789378, at *1 (N.D. Cal. April 26, 2013) (stating that the court has a "continuing duty" to dismiss an *in forma pauperis* action if it determines that the complaint is frivolous or malicious, fails to state a claim, or seeks monetary relief against a defendant who is immune from such relief); Anderson v. Macy's, Inc., No. 2:12-cv-556, 2013 WL 1857535, at *7 n.13 (W.D. Pa. May 2, 2013) (same); Gunn v. Steed, No. 10-3213, 2012 WL 1327795, at *1 (D. Kan. April 17, 2012) (same); Days v. Johnson, No. Civ. A. 5:01-CV-305-C, 2004 WL 2101725, at *1 (N.D. Tex. Sept. 15, 2004) (same).

Section 29-20-201(a) of the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-101 et seq., provides that "[e]xcept as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for

any injury which may result" from the exercise of government duties. "No party may bring a suit against 'the State' except 'in such manner and in such courts as the Legislature may by law direct.'" Davidson v. Lewis Bros. Bakery, 227 S.W.3d 17, 19 (Tenn. 2007) (quoting Tenn. Const. art. I, § 17). "The State" includes municipalities. Id. (citation omitted). The TGTLA removes immunity for "injury proximately caused by a negligent act or omission of any employee within the scope of his employment," but provides a list of exceptions to this removal of immunity. Tenn. Code Ann. § 29-20-205. Injuries that "arise[] out of . . . civil rights" are one such exception, that is, sovereign immunity continues to apply in those circumstances. Id. The Sixth Circuit and the federal courts in Tennessee have construed TGTLA's "civil rights" exception to include claims arising under 42 U.S.C. § 1983 and the United States Constitution. See Johnson v. City of Memphis, 617 F.3d 864, 871-72 (6th Cir. 2010); Eibel v. Melton, No. 2:10-128, 2012 WL 5247282, at *22 (M.D. Tenn. Oct. 23, 2012); Okolo v. Metro. Gov't of Nashville, 892 F. Supp. 2d 931, 947 (M.D. Tenn. 2012); Monroe v. McNairy Cnty., No. 07-1055, 2012 WL 393108, at *21 (W.D. Tenn. Feb. 6, 2012); Dillingham v. Millsaps, 809 F. Supp. 2d 820, 852 (E.D. Tenn. 2011); Stone v. City of Grand Junction, 765 F. Supp. 2d 1060, 1078-79 (W.D. Tenn. 2011); Campbell v. Anderson Cnty., 695 F. Supp. 2d 764, 778 (E.D. Tenn. 2010).

In this case, the plaintiffs claim that while they were

incarcerated at the SCCC, Shelby County allowed the SCCC to become infested with spiders, and as a result, the county failed to keep the facility free of dangerous conditions. They allege that the repeated spider bites and delays in providing healthcare resulted in cruel and unusual punishment under the Eighth and Fourteenth Amendments. Plaintiffs' negligence claims against Shelby County are based on the same acts that give rise to the § 1983 claims. Thus, the TGTLA bars the plaintiffs' state law negligence claims against Shelby County. See Johnson, 617 F.3d at 872 ("Plaintiff's claim regarding the dispatcher's negligence arises out of the same circumstances giving rise to her civil rights claim under § 1983. It therefore falls within the exception listed in § 29-20-205, and the City retains its immunity."); Monroe, 2012 WL 393108, at *21 (holding that because plaintiffs' claims against county and the officers of its sheriff's department arose out of the same circumstances giving rise to their civil rights claim under § 1983 for violations of plaintiffs' constitutional rights, the TGTLA's civil rights exception applied); Dillingham, 809 F. Supp. 2d at 852 (holding that plaintiffs' negligence claim against the county, which arose out of allegation that county failed to train its officers under § 1983, was barred under the civil rights exception of the TGTLA); Campbell, 695 F. Supp. 2d at 778 (holding that plaintiff's negligence claim was barred under the civil rights exception of the TGTLA because the claim was predicated on

intentional tortious conduct involving the violation of her civil rights by county employees); <u>Shelton v. Rutherford Cnty.</u>, No. 3:09-cv-0318, 2009 WL 2929394, at *12 (M.D. Tenn. Sept. 8, 2009) (where "negligence claims are asserted in the context of a civil rights case and are based upon the same actions that gave rise to the civil rights claims . . . the cause of action falls within . . . [the] immunity granted under Tenn. Code Ann. § 29-20-205"); <u>Butler v. City of Englewood</u>, No. 1:07-cv-184, 2008 WL 4006786, at *3 (E.D. Tenn. Aug. 25, 2008) (holding that where plaintiff's state law claims "clearly arise out of and directly flow from the allegations that the police officer deprived [plaintiff] of [her] civil rights," the municipality was entitled to immunity under the TGTLA); <u>see also</u> <u>Jackson v. Thomas</u>, No. M2010-01242-COA-R3CV, 2011 WL 1049804, at *7 (Tenn. Ct. App. Mar. 23, 2011) (dismissing a claim for negligence against the county under the civil rights exception, where plaintiff asserted Fourth Amendment violation as a result of the erroneous issuance of an arrest warrant).

For these reasons, the court grants summary judgment for Shelby County on all of the plaintiffs' state law negligence claims brought against the county.

## III. CONCLUSION

For the reasons stated above, CMS is entitled to summary judgment against plaintiffs Braswell, Butler, Dyson, Edwards, Johnson, and Rubin, and therefore all claims brought by these six

plaintiffs against CMS are dismissed with prejudice.  Shelby County

is entitled to summary judgment on the negligence claims brought by

all named plaintiffs, and therefore these negligence claims for all

named plaintiffs are dismissed with prejudice.

    IT IS SO ORDERED.

                              s/ Tu M. Pham
                              TU M. PHAM
                              United States Magistrate Judge

                              March 31, 2014
                              Date